58 N.J. Super. 386 (1959)
156 A.2d 260
BENJAMIN MANNING, PLAINTIFF-APPELLANT,
v.
PUBLIC SERVICE ELECTRIC AND GAS CO., A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 13, 1959.
Decided December 4, 1959.
*389 Before Judges PRICE, SULLIVAN and FOLEY.
Mr. Jerry M. Finn argued the cause for plaintiff-appellant (Messrs. Greenstone & Greenstone, attorneys).
Mr. Luke A. Kiernan, Jr., argued the cause for defendant-respondent (Mr. Herman H. Wille, Jr., of counsel).
The opinion of the court was delivered by FOLEY, J.A.D.
In this negligence case plaintiff appeals from a judgment entered in the Law Division on a jury verdict of no cause of action.
On May 24, 1956 plaintiff, a masonry worker in the employ of Puratex Stone Co., was engaged in resurfacing the front of a building situated on the westerly side of Grand Avenue in Palisades Park, New Jersey. The work required him and a co-worker to operate from a scaffold which was suspended at its northerly end by ropes attached to the upper part of the building and at its southerly end was rested on the railing of a fire escape platform. In order to supply these workmen with mortar, two other men mixed it on the ground and then raised it by means of a rope and pulley apparatus. Plaintiff, in reaching for a bucket thus raised, received a severe shock when the bucket came in contact with an adjacent uninsulated high tension wire which was maintained by the defendant. The wire carried approximately 4,000 volts. The shock stunned him and he lost his balance and fell to the ground. Defendant had no knowledge that work was being performed in the vicinity of its high tension wires until after the accident occurred.
The theory of liability advanced by plaintiff was that defendant was negligent (1) in having violated the requirements of the National Electrical Safety Code (hereinafter referred to as the Code) with respect to the installation and maintenance of uninsulated high tension wire, and (2) in having violated a common law duty to exercise a high degree of care to install and maintain the wire in *390 such manner and at such place as to avoid foreseeable injury to those who themselves were in the exercise of reasonable care. The Code was adopted by the Board of Public Utility Commissioners pursuant to R.S. 48:2-23 and was in force at the time of the accident. Pertinent provisions follow:

"Sec. 23. Clearances.

* * * * * * * *
234. Clearances of Conductors of One Line From Other Conductors and Structures.

* * * * * * * *
C. Clearances from Buildings  * * *
4. Conductors Passing By Or Over Buildings.
(a) Minimum Clearances. Unguarded or accessible supply conductors carrying voltages in excess of 300 volts between conductors shall not come closer to any building or its attachments (balconies, platforms, etc.) than listed below, except that this rule should not be interpreted as restricting the installation of a trolley contact conductor over the approximate center line of the track it serves

* * * * * * * *

 Table 4. Clearances of supply conductors from buildings.
 (All voltages are between conductors)
 Voltage of supply Horizontal Vertical
 conductors clearance clearance
 Feet Feet
 300 to 8.700 3 8"

In connection with the construction of this regulation section 20, subsection 202 has bearing:

"Sec. 20. Scope, Nature and Application of Rules.

* * * * * * * *

202. Minimum Requirements.
The rules state the minimum requirements for spacings, clearances, and strength of construction. More ample spacings and clearances or greater strength of construction may be provided if other requirements are not neglected in so doing.
Note: Some of these minimum values are exceeded in much existing construction; service requirements frequently call for stronger supports and higher factors of safety than the minimum requirements of these rules."
There is no dispute as to the relative position of the essential objects. The platform of the fire escape, suspended *391 at the southern end of the building, extended horizontally three feet from the building to a railing. In addition, there was a seven-inch horizontal extension created by a decorative bow which was attached to the exterior of the railing. The railing extended vertically from the base of the platform 37 inches. Of this, four inches were composed of another decorative curved structure. The boom of the aforementioned hoisting apparatus was attached to the roof at the northern end of the building and extended 22 inches out from the front of it. The bucket was approximately 30 inches at its widest point. The wire, part of a four wire system, was: four feet eleven inches from the face of the building; approximately two feet from the outermost edge of the fire escape; and was six feet three inches in a vertical plane from the top of the railing excluding the elevated bowed decorative portion of four inches. The face of the building was in a north-south plane and the wires, running parallel thereto, were supported by poles erected along the curb in front of the building. The scaffold was 18 inches wide and approximately 20 feet long. Plaintiff and the hoisting mechanism were at the northern section of the scaffold at the time of the accident. The fire escape at the southern section was in no way involved in plaintiff's activities. The wires in question were 33 1/2 feet above the ground, thus satisfying another section of the Code which required a minimum height of 20 feet.
The initial problem presented to the trial court was one of construction of the Code. Specifically, the question was: Do the "minimum clearances" provided in section 23, subsection 234, require both a horizontal clearance of three feet and a vertical clearance of eight feet from the building, or was it intended that these should be considered as alternative requirements, in the sense that the vertical clearance applies only to wiring passing over the "building or its attachments (balconies, platforms, etc.)," all other installations, including that here involved, being subject only to the necessity of a three-foot clearance from the side of the *392 building and structures attached thereto? The court reached the latter conclusion, held as a matter of law that the defendant's installation conformed with the Code requirements since the wire was in excess of three feet from the side of the building at the point where plaintiff was working, and expressly charged the jury to this effect. Thus the court removed violation of the Code as a ground on which the jury might predicate liability and confined the determination of defendant's negligence to whether or not defendant had violated its common law duty as above set forth.
It is urged by the plaintiff that the elimination from the case of the alleged violation of the Code constituted a judicial usurpation of the function of the jury. It is argued that upon the basis of certain conflicts in the expert testimony to which we will hereinafter refer the jury should have been permitted to decide whether the Code contemplated as minimum requirements both a horizontal clearance of three feet and a vertical clearance of eight feet, rather than either the one or the other. But this contention runs afoul of the principle that within their allotted sphere the rules and regulations of a state administrative agency duly promulgated under properly delegated powers have the force and effect of law, State v. Atlantic City Electric Co., 23 N.J. 259, 270 (1957); from which it follows that the construction of such rules and regulations is subject to the fundamental concept that the interpretation of a statute is for the court, not the jury.
No doubt this branch of the plaintiff's argument is founded on the fact that one of plaintiff's experts, Isaac Stewart, testified that the wire was in violation of the Code because it was less than eight feet above the guard rail of the fire escape and less than three feet from the ornamental or decorative bows attached to the railing. He expressed the opinion that the Code compelled compliance with both horizontal and vertical requirements despite his admission that it is permissible to run a wire over the top of a building, provided it is not less than eight feet above the roof *393 or an attachment thereto. It is obvious that in such circumstances the required horizontal clearance of three feet could not be met. In practical effect, Mr. Stewart's interpretation would mean that if a power company found it necessary to install a high tension wire three feet from the side of a skyscraper, it would be obliged to run the wire eight feet above the top of the building, notwithstanding that the Code fixes the minimum height as 20 feet above ground level. The theory advanced by Mr. Stewart was rejected by plaintiff's other expert, Solomon Fishman, as is demonstrated by his answers to interrogation by the court:
"The Court: If it is 8 feet above the building, it can go right over the top of the building, isn't that right?
The Witness: Yes, sir.
The Court: And it would comply with the requirements.
The Witness: Yes, sir.
The Court: And if it is 3 feet away from the nearest fixture on the building, it needs only to be 20 feet high, even though the building might be 40 feet high. Is that right?
The Witness: Yes, sir."
The experts called by defendant also testified that the installation was in conformity with the Code by reason of compliance with the minimum horizontal clearance of three feet.
It is not unusual for experts called by opposing sides to differ concerning the safety of a given facility, conformity with standards of construction or installation, or even as to the standard itself. In such circumstances their conflicting opinions usually are for jury consideration. Had the court determined here that the intent of the Code was that every installation of uninsulated wire should meet the minimum clearance requirements both horizontally and vertically, the expert testimony tending to support such conclusion would have been the subject of consideration by the jury in its appraisal of the connection between noncompliance with the Code and defendant's duty to exercise a *394 high degree of care in plaintiff's behalf. But that is not the point. As we have said, it was the duty of the court to interpret the Code, that is to say, to determine the meaning of it. Conflicts in the expert testimony relating to the meaning of the Code were for resolution by the court alone, and thus did not raise a jury question of defendant's ultimate responsibility.
The purpose of judicial interpretation is the discovery of the true sense of the form of words which are used, taking all parts into consideration, and if fairly possible, giving them all effect. Whether the subject matter of such interpretative inquiry be an agreement between parties, a statute, or a constitution, the object is the thought which it expresses. Murphy v. Zink, 136 N.J.L. 235, 239 (Sup. Ct. 1947), affirmed 136 N.J.L. 635 (E. & A. 1948). See also Inhabitants of Orvil Tp. v. Borough of Woodcliff, 64 N.J.L. 286 (E. & A. 1900); Newell v. People, 7 N.Y. 9, 97 (Ct. App. 1852). In this instance the objectives sought to be attained are set forth in the Code itself:

"214. Isolation and Guarding.
A. Current-carrying Parts.
To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons." (Emphasis added)
We are satisfied that the trial court's construction of the Code which necessitated its removal from the case as a ground of liability was sound.
On the oral argument plaintiff asserted that independently of the alleged violation of the Code a jury question of defendant's responsibility was presented by the evidence relating thereto. This point was not made in the appellant's brief but it was argued in opposition to defendant's motion for a judgment of involuntary dismissal at the trial, and it was referred to in the court's charge. We shall consider it.
*395 The thesis offered is that since the Code merely provides minimum clearance requirements, compliance with the same was not an absolute defense to the action; rather, it was for the jury to say whether or not under all the circumstances displayed by the evidence the defendant discharged its duty to the plaintiff in locating the wire where it did. We are in accord with the contention that compliance with the Code does not necessarily preclude a recovery in this type of case. By analogy, this view is supported by the established rule that, while ordinarily the adoption and operation of a method which accords with that in general use by well regulated companies satisfies the duty of care owed, nevertheless the care which must be exercised over the construction and maintenance of a highly destructive agency requires more than the use of mere mechanical skill and approved mechanical appliances. It includes also circumspection and foresight with regard to reasonably probable contingencies. See Beck v. Monmouth Lumber Co., 137 N.J.L. 268 (E. & A. 1948). See also Adams v. Atlantic City Electric Co., 120 N.J.L. 357 (E. & A. 1938); Heyer v. Jersey Central Power & Light Co., 106 N.J.L. 211 (E. & A. 1929).
But recovery upon the basis of the infraction of a common law duty depends upon a showing that the defendant acted improperly, or failed to act at all, in a situation where an accident such as occurred here was reasonably foreseeable. The test of liability is whether under the particular circumstances the injury ought reasonably to have been anticipated. Beck v. Monmouth Lumber Co., supra, 137 N.J.L. at page 273. It is not disputed that the wire in question was strung more than 50 years ago with the permission of the municipality and in accordance with the provisions of R.S. 48:7-1 et seq., which permit utility companies to use public streets for the purpose of erecting poles to sustain necessary wires and fixtures. There is no evidence that in the half-century intervening between the installation and the accident the wire had been a source *396 of danger to any person. Moreover, the court may judicially notice that this installation differed not in the slightest from the countless miles of uninsulated high tension wires which furnish the lifeblood of industry, commerce and public convenience, here and elsewhere. Notwithstanding, it is suggested that the defendant was bound to foresee that as time passed it would become necessary to repair the side of the building adjacent to the wire, and that such work would involve the use of a scaffold which would bring workmen in close proximity to it. The argument is lacking in logical appeal for several reasons. In the first place, if this contingency be regarded as having been reasonably foreseeable by defendant, seemingly the importance of it must have occurred to the framers of the Code and have been reflected in the clearance requirements contained therein. Furthermore, according to the testimony, the outer edge of the scaffold on which plaintiff was working was in excess of three feet from the wire; and it is entirely clear that the injury resulted not from plaintiff's contact with the wire but from his contact with the bucket which had been energized by the wire. But, more importantly, by legislative enactment any notion of the obligation of a power company to foresee the performance of work of the kind here involved is dispelled, absent proof of actual knowledge in the power company that such work was to be undertaken. Section 5 of the High Voltage Lines Act, L. 1948, c. 249 (N.J.S.A. 34:6-47.5), which was adopted shortly after Beck v. Monmouth Lumber Co., supra, was decided provides:
"Notification to power company and responsibility for safeguards.
When any operations are to be performed, tools or materials are to be handled, or equipment is to be moved or operated, within six feet of any high-voltage line, the person or persons responsible for the work to be done, shall promptly notify the operator of the high-voltage line of the work to be performed and such person shall be responsible for the completion of the safety measures, which are required by sections two and three of this act, before proceeding with any work which would impair the aforesaid clearance."
*397 The statute is penal in character, violators being subject to fine or imprisonment or both.
It stands without question that the notification required by the statute was not transmitted to the defendant. If by any process of reasoning it is inferable that defendant should have foreseen that work within the prohibited area might at some time be in contemplation, there is no rational basis to infer that the defendant should have foreseen that it would be commenced without notice in direct violation of the statutory mandate.
It is our conclusion, therefore, that since there was neither evidence of violation of the Code nor evidence of a reasonably foreseeable risk of harm in defendant's lawful installation and maintenance of its wires, the motion for involuntary dismissal should have been granted.
This disposition makes moot appellant's second point that the court erred in its interpretation of N.J.S.A. 34:6-47.5 as it bore upon the workmen's duty to comply with its provisions. Because any view expressed by us as to our interpretation of the statute in this connection would be dicta we leave resolution of this interesting question to a case in which it is squarely in issue. Likewise other criticisms of the court's charge are of no consequence, in view of our decision that the case should not have been submitted to the jury.
In affirming we observe that the submission of a case to a jury which arrives at the same result the court should have reached as a matter of law furnishes no ground for reversal. Mallery v. Erie R. Co., 86 N.J.L. 210 (E. & A. 1914).
Affirmed.