106 N.J. Super. 527 (1969)
256 A.2d 289
JULIA GALLAS, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF STEPHEN GALLAS, DECEASED, PLAINTIFF-APPELLANT,
v.
PUBLIC SERVICE ELECTRIC AND GAS CO., HATCO CHEMICAL COMPANY, A DIVISION OF W.R. GRACE & COMPANY, A CORPORATION, AND W.R. GRACE & COMPANY, A CORPORATION, DEFENDANTS AND THIRD-PARTY PLAINTIFFS-RESPONDENTS, AND BETHLEHEM STEEL CORPORATION  BUFFALO TANK DIVISION, THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 1968.
Decided August 4, 1969.
*530 Before Judges GAULKIN, COLLESTER and LABRECQUE.
Mr. Alan E. Davis argued the cause for appellant (Messrs. Wilentz, Goldman & Spitzer, attorneys; Mr. Henry M. Spitzer, of counsel).
Mr. Edward E. Kuebler argued the cause for respondent Hatco Chemical Company, a division of W.R. Grace & Company, a corporation, and W.R. Grace & Company, a corporation.
Mr. Luke A. Kiernan, Jr. argued the cause for respondent Public Service Electric and Gas Co. (Mr. Herman H. Wille, Jr., of counsel).
Mr. John M. Walsh argued the cause for respondent Bethlehem Steel Corporation  Buffalo Tank Division (Messrs. O'Mara, Schumann, Davis & Hession, attorneys).
The opinion of the court was delivered by LABRECQUE, J.A.D.
In this wrongful death action plaintiff Julia Gallas, administratrix ad prosequendum of *531 the estate of her husband Stephen, appeals from judgments of involuntary dismissal entered at the conclusion of the case in favor of defendants Public Service Electric and Gas Company (Public Service), Hatco Chemical Company and W.R. Grace & Company (Grace) and Bethlehem Steel Corporation  Buffalo Tank Division (Bethlehem).
Decedent had been employed as a welder by K.L.O. Welding Erectors Co. (K.L.O.) for eight to ten years prior to his death. K.L.O. is primarily engaged in the construction of steel tanks, smoke stacks and water towers. On January 23, 1964 Hatco Chemical Company (Hatco), a division of Grace, contracted with Bethlehem for the purchase and construction of a steel water tank on the premises of its chemical plant at Fords, Middlesex County. Bethlehem subcontracted the construction of the tank to K.L.O., which was to construct the tank with fabricated steel provided by Bethlehem. The tank was to be 33 feet high with a diameter of 40 feet and a capacity of 300,000 gallons. The foundation for the tank  consisting of a concrete ring wall extending four feet below and two feet above ground, and filled with sand  was to be constructed by another contractor and was, in fact, ready at least two weeks prior to the accident. It was located to the left of the access road into this portion of the premises and beyond a fence which separated the parking lot from this area.
On the morning of September 21, 1965 three K.L.O. employees, including the decedent and Patrick Ivan, K.L.O.'s field superintendent, visited the job site, but did no work and remained for only a few hours. The mobile crane or "cherry picker" here involved  which was to be used in the construction of the tank  had arrived earlier in the day and was on a trailer which was parked in the Hatco parking lot. Mounted on caterpillar treads and powered by a gasoline motor, the crane had a 26-foot boom, mounted on top, which could be raised or lowered and could be turned in all directions (360 degrees).
*532 On the following morning Ivan, Gallas and Gural, another welder, returned to the job site at approximately 8 A.M. In the absence of the regular crane operator (he was not due to arrive until 10:30 A.M.), Ivan  who was qualified  received permission to operate the crane. In the meantime a truckload of steel plates to be used on the job had arrived and Ivan asked the driver of the truck to move the trailer from the parking lot to the job site. The trailer was then brought through the gate at the far end of the parking lot to a position on the access road within 50 feet of the job site. The access road was macadam and ran at a slight incline downhill from the gate. Some 75 feet beyond the point where the trailer was first stopped the access road was crossed by two electric lines, 26 feet high, each consisting of three wires mounted on wooden poles, which led into a power substation owned by Hatco, located approximately 200 feet from the job site. The wires  which, it later appeared, carried 26,400 volts  were uninsulated. They were operated and maintained by Public Service whose employees had allegedly last inspected them on September 21, 1965.
Before the crane was actually unloaded, the trailer had to be backed down the access road a few more feet (towards the wires) to facilitate the passage of an oil delivery truck. The crane was then backed off the trailer through the use of skids approximately 18 feet long, and was moved three to four feet beyond the skids. At this time, the boom was down flat and pointed toward the gate. Then, upon noticing a faulty cable, Ivan directed Gallas to assist him in changing it. When installing a new cable it is the usual practice to raise the boom in order to insure that the cable remains taut. The new cable was almost on and Ivan had started to raise the boom, when another truck driver asked that the crane be moved. Acceding to this request, Ivan backed the crane another 30 feet down the road toward the wires. The front of the crane (the radiator) was now only ten feet (using an imaginary perpendicular plum line) from the nearest wire. Ivan, who by then was aware of the presence of *533 the electric wires, then proceeded to raise the boom to an angle of 70 degrees and instructed Gallas to get a "bull pin" (a foot long piece of tapered steel) and hit the new cable so that it would be tight as it was wrapped around the cable drum. The crane was then several feet away and to the right of a stack of from one to two hundred metal barrels, piled three and four high. As Gallas was in a position between the crane and the barrels doing as he was ordered, the boom in some manner contacted the overhead wire and the electric current passed through him. Ivan testified he leaped from the crane and was immediately "bolted" about ten feet. He stated that although the hog line  a supporting cable extending from the top of the boom backward to the rear of the crane  had been at least three feet from the nearest wire before the accident, afterwards it was in contact with it. The area surrounding the crane, including the stack of barrels, remained electrified until someone knocked the cable away from the latter.
At the conclusion of the testimony defense motions for dismissal were granted, the court finding that absent knowledge by Public Service of the work being performed by K.L.O., the proofs could not support an inference that it had violated any statutory duty or its common law duty to exercise a high degree of care in installing and maintaining its wires and poles. It ruled that the installation conformed with the electrical code requirements and that it was not foreseeable that work would be done in proximity to the wires without notice to it as required by statute. The court also determined that Bethlehem owed neither a statutory nor a common law duty to plaintiff since it had merely engaged the services of K.L.O. and exercised no control over the job, and that Grace (Hatco) breached no duty owing to decedent since (1) it was not obligated to notify Public Service of the impending work to be done by K.L.O. or Bethlehem, (2) it was not required to guard against the hazard posed by the electric wires and (3) the movement of the boom by Ivan was an independent *534 intervening cause which was not within the realm of foreseeability. Plaintiff appeals from the court's ruling as to all three defendants.
It is axiomatic that in passing upon a defendant's motion for involuntary dismissal the court is compelled to view plaintiff's evidence as true and draw therefrom every legitimate inference of fact in her favor. Long v. Landy, 35 N.J. 44, 53-54 (1961). The motion is to be denied unless it can be said that reasonable men may not honestly differ as to whether defendant had breached a duty owing to plaintiff. Black v. Public Service Elec. & Gas Co., 98 N.J. Super. 366, 376 (App. Div. 1968). Plaintiff urges that each of the defendants owed a duty to decedent and the evidence adduced was sufficient to call for a jury determination as to whether there had been a breach of that duty.

AS TO BETHLEHEM STEEL
In seeking to impose liability upon Bethlehem, plaintiff relies principally upon its omission to give notice to Public Service as allegedly required by N.J.S.A. 34:6-47.5. That statute then provided:
"When any operations are to be performed, tools or materials are to be handled, or equipment is to be moved or operated, within six feet of any high-voltage line, the person or persons responsible for the work to be done, shall promptly notify the operator of the high-voltage line of the work to be performed and such person shall be responsible for the completion of the safety measures, which are required by sections two and three of this act, before proceeding with any work which would impair the aforesaid clearance."[1] *535 A high voltage line is defined as one carrying in excess of 750 volts. N.J.S.A. 34:6-47.1. Here, as noted, the voltage was 26,400.
The trial court interpreted N.J.S.A. 34:6-47.5 as placing responsibility for compliance with it upon the party exercising control and dominion over the work project and reasoned that since the evidence failed to demonstrate that Bethlehem was exercising such control it was not a "person * * * responsible for the work to be done."
Plaintiff urges that the court erred in so holding and that by virtue of the statute Bethlehem (as well as Grace) was required to notify Public Service of the impending work to be performed by K.L.O. It is conceded that no such notice was given by either.
We know of no reported case in this State which has passed upon the issue presented. The cited section was a portion of the so-called High Voltage Lines Act, L. 1948, c. 249. Section 2 thereof, N.J.S.A. 34:6-47.2, provided:
"No person, firm, or corporation, or agent of same, shall require or permit any employee to perform any function in proximity to high-voltage lines; to enter upon any land, building, or other premises and there to engage in any excavation, demolition, construction, repair or other operation; or to erect, install, operate or store in or upon such premises any tools, machinery, equipment, materials, or structures, including house moving, well drilling, pile driving or hoisting equipment, unless and until danger from accidental contact with said high-voltage lines has been effectively guarded against in the manner hereinafter prescribed."
From our consideration of sections 2, 3, 4 and 5 of the act, N.J.S.A. 34:6-47.2, 3, 4 and 5, we are satisfied that they had application to employers whose employees would be subject, in the performance of the work required of them, to danger from high voltage lines. This construction is confirmed by the 1966 amendments to the cited sections. Section 2 now recites that "no employer or supervising agent of an employer shall require or permit an employee, etc." As noted, section 5 as amended refers *536 to activity "requiring precautionary action under section 2 of this act."
Here the "activity" was the construction of the water tank and, so far as the evidence disclosed, K.L.O. was the employer, contractor or other person responsible for its construction. There was a total absence of proof upon which to base an inference that Bethlehem was exercising control over the job at the time in question. We therefore hold that the involuntary dismissal as to Bethlehem was proper. Cf. Hayden v. Paramount Productions, 33 Cal. App.2d 287, 91 P.2d 231 (D. Ct. App. 1939); Dees v. L.F. Largess Company, 1 Mich. App. 421, 136 N.W.2d 715 (Ct. App. 1965); Mack v. Marshall Field & Co., 218 N.C. 697, 12 S.E.2d 235 (Sup. Ct. 1940).

AS TO PUBLIC SERVICE
On the issue of the liability of Public Service plaintiff contends, in substance, that, in line with its duty to exercise a high degree of care in connection with the maintenance of its high tension line, it should have given warning of the danger and should have taken steps "to avoid or remedy the dangerous condition resulting from the performance of the work herein involved." She further challenges the exclusion of the testimony of her electrical expert under whose interpretation of the National Electrical Safety Code, Public Service could have been held to be in violation.
We concur in the court's conclusion, based upon its interpretation of the Code, that the power line in question did not violate the standards fixed by the National Electrical Safety Code in the manner of its installation or maintenance. The Code was adopted by the Board of Public Utility Commissioners pursuant to R.S. 48:2-23 and its interpretation was for the court rather than plaintiff's expert. Manning v. Public Service Elec. & Gas. Co., 58 N.J. Super. 386, 392 (App. Div. 1959).
*537 Plaintiff urges that even if it be determined that there was compliance with the Code, Public Service remained under a common law duty to exercise a high degree of care for the decedent's safety while he was employed upon the premises. The law applicable in such a situation has been fully set forth in other cases and need not be repeated here. See Beck v. Monmouth Lumber Co., 137 N.J.L. 268 (E. & A. 1947); Manning v. Public Service Elec. & Gas Co., supra, and Black v. Public Service Elec. & Gas Co., supra. Plaintiff urges that there was evidence to sustain a finding that this duty was violated. We disagree.
Recovery on the basis of violation of its common law duty depended upon a showing that Public Service had failed to act (or had acted improperly) in a situation where an accident such as the one here involved was reasonably foreseeable. Manning v. Public Service Elec. & Gas Co., supra, 58 N.J. Super., at p. 395; Beck v. Monmouth Lumber Co., supra, 137 N.J.L., at pp. 272-73. Here its power lines were located beyond the parking lot in an area which could be reached only by passing the guard at the gate and then passing through another gate which separated the parking lot from the area. The record is devoid of proof that Public Service knew or should have known at the time they were installed in 1960 that tanks would be constructed in their vicinity, and that such construction would be undertaken without the notice to it required by the High Voltage Lines Act. Cf. Manning v. Public Service Elec. & Gas Co., supra, 58 N.J. Super, at p. 397. We note that the Code did not require the placing of signs on poles which, as here, cannot be climbed.
In the absence of prior notice, the duty imposed upon Public Service, whether by N.J.S.A. 34:6-47.5 (as then in effect) or at common law, depended upon whether it had notice of the construction here involved, Manning v. Public Service Elec. & Gas Co., supra, at p. 396; Black v. Public Service Elec. & Gas Co., supra, 98 N.J. Super., at *538 p. 375. It is conceded that it received no express notification, and we are satisfied that the proofs could not support a finding that it had implied notice thereof. From the fact that the Public Service employee who allegedly had inspected the line on the day prior to the accident could have seen a flat-bed trailer carrying a mobile crane, it cannot be said that it was chargeable with notice that a tank was to be constructed in close proximity to its wires. The trailer was located in the parking lot at least 250 feet from the construction site and separated from it by a fence. The boom of the crane was down and there were concededly no signs of activity in connection with it. To all intents and purposes, it would have been reasonable to conclude that it was merely being parked there  or that its owner would give the statutory notice if and when it was to be operated in the vicinity of the wires. Manning v. Public Service Elec. & Gas Co., supra, 58 N.J. Super., at p. 397.
Plaintiff challenges the striking of the testimony of its electrical expert, Newton. His qualifications were not disputed. His testimony was stricken at the conclusion of the case, substantially for the reason that it was based upon his own interpretation of the Code whereas, under the court's interpretation, which was binding, no Code standard had been violated. Plaintiff now argues that this opinion, given in response to a hypothetical question, was not based solely upon his contention that the Code had been violated, but was also based upon the failure of Public Service to follow good engineering practice.
While it would have been better had the trial judge clarified his ruling by confining the exclusion to such portions of the testimony of the witness as were based upon the asserted violation of the Code, we are cognizant of the difficulty which a jury would have in applying his ruling and we conclude that, in any event, plaintiff suffered no prejudice from his omission to do so. R.R. 1:5-3(b).
When asked to justify his opinion, in response to a hypothetical question, that the installation of the overhead *539 conductors was not in accordance with good, safe and accepted practice, the witness testified that the provisions of the Code which required that such installations be designed so as to reduce hazards as far as was practicable, had not been met. Later, however, he testified:
"It is, in my opinion, standard practice to run overhead lines of this sort uninsulated and I believe, in my opinion, there is good reason for this."
While he later modified this opinion somewhat, he also testified:
"Q And compliance with the code, in a general sense, means that there's been good engineering practices followed so long as the code is complied with, don't you concede that?
A As long as the code is complied with.
Q As long as the code is complied with?
A Correct.
Q You would not be critical of the engineering practices of the utility as long as it complied with the code?
A That's correct." (Emphasis added)
And further:
"Q Well, we had decided, we had agreed, that there were no specific requirements in the code for wires to go underground?
A That's correct.
Q And we had agreed that there was no specific requirement in the code that the wires be covered with insulation?
A That's correct.
Q And we agreed that the code required on public streets a minimum height of 22 feet under the clearance?
A That's correct.
Paragraph 211 of the Code, on which the witness principally relied, provided that, "All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable." However, he conceded that this was a fair statement of the intendment of that portion of the Code, and the court ruled that it was no more than a general statement *540 of the Code's objectives. Paragraph 214A of the Code, on which Newton also relied, provided that:
"To promote safety to the general public and to employees not authorized to approach conductors and other current-carrying parts of electric supply lines, such parts shall be arranged so as to provide adequate clearance from the ground or other space generally accessible, or shall be provided with guards so as to isolate them effectively from accidental contact by such persons."
He conceded that this section called for either adequate clearance or proper guarding of the lines. He further conceded that paragraph 232 of the Code provided for clearances of 22 feet over public streets, alleys or roads in urban or rural districts, and over driveways to residences and garages. Here, as noted, at the point where the wires crossed the roadway the clearance exceeded 26 feet.
Further, the witness's opinion in response to the hypothetical question, assuming it to have been based upon failure to follow good engineering practice, was posited upon certain factors which were not present in the case. Evidence Rule 56(2). Cf. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305 (1954). Thus it was based upon the use of a crane to pile barrels in the vicinity of the wires, the use of the road by "all sorts of vehicles" and the presence of "other towers in the vicinity." Actually, the "road" in question was no more than the means whereby access was had from the parking lot to this somewhat restricted area of Hatco's premises. It was separated from the parking lot by a metal fence equipped with a gate which could be swung across the roadway. There was no proof that cranes were being used in that area for any purpose at the time the line was installed and it is clear that there were no towers in the vicinity of the power line until construction of the water tank here involved.
We fail to see how plaintiff could have suffered any legal prejudice from the striking of the testimony. Its exclusion was not inconsistent with substantial justice. Lieberman v. Saley, 94 N.J. Super. 156, 162 (App. Div. 1967).
*541 We have also considered plaintiff's challenge to the court's rulings on objections to questions put to Newton on redirect and find no abuse of discretion.
It follows that the involuntary dismissal as to defendant Public Service should be affirmed.

AS TO GRACE
Turning first to plaintiff's contention that the evidence presented raised jury questions as to whether Grace had breached its statutory duty as imposed by N.J.S.A. 34:6-47.2 and 47.5, we are satisfied that neither section of the statute required it to control the activities of decedent or to give the statutory notice for his protection. Contrary to plaintiff's contention, N.J.S.A. 34:6-47.2 imposed a duty on a "person, firm, or corporation" only with respect to its own employees. Here, Grace neither exercised, nor purported to exercise any control over K.L.O.'s employees.
An employee of an independent contractor, such as was Gallas, who is engaged in work on the premises of an owner who has contracted with his employer for the work he is doing, is an invitee of the owner. Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 219 (1954); Farrell v. Diamond Alkali Co., 16 N.J. Super. 163, 167 (App. Div. 1951); Beck v. Monmouth Lumber Co., supra, 137 N.J.L., at p. 275. As to him, the owner is duty bound to exercise reasonable care to maintain the premises in a reasonably safe condition for the purposes embraced within the invitation. Piro v. Public Service Elec. & Gas Co., 103 N.J. Super. 456, 463 (App. Div. 1968), affirmed 53 N.J. 7 (1968); Zentz v. Toop, 92 N.J. Super. 105, 111 (App. Div. 1966), affirmed 50 N.J. 250 (1967); Murphy v. Core Joint Concrete Pipe Co., 110 N.J.L. 83, 86 (E. & A. 1932).
Here K.L.O. was to construct a water tank 33 feet high at a point which was to the left of the roadway leading into the premises and just beyond the fence which separated the premises from the parking lot. The distance *542 from the tank to the nearest wire of the power line was approximately 50 feet. The tank was to be built of steel plates which were to be welded on the job. Of necessity this required the use of a crane which would be capable of raising the plates so that the tank could be built to the prescribed height. In the performance of the work the crane would necessarily be required to operate over a work area which, at the least, would give it access to all sides of the tank and to the place where the materials to be used were to be stored.
From the foregoing the jury might well have concluded that reasonable circumspection and foresight dictated the taking of reasonable precautions to prevent injury, by reason of the proximity of the power line, to those about to embark on construction of the tank. Kappertz v. R.B. McEwan & Son, 106 N.J.L. 484 (E. & A. 1929); Beck v. Monmouth Lumber Co., supra. The fact that the fatal accident occurred when the crane was being made ready to begin construction rather than after the actual construction had begun did not negate liability. It was not necessary that Grace should have anticipated the very occurrence which resulted from its asserted wrongdoing so long as it was in the realm of foreseeability that some harm might occur thereby. Mayer v. Housing Auth. of Jersey City, 84 N.J. Super. 411, 425 (App. Div. 1964), affirmed 44 N.J. 567 (1965); Avedisian v. Admiral Realty Corp., 63 N.J. Super. 129, 133 (App. Div. 1960); Black v. Public Service Elec. & Gas Co., supra. Here the jury could well have found that it was within the realm of foreseeability that the boom of the crane might accidently contact the power line while in or about the work area.
Defendant urges that the trial judge determined that the hazard presented by the power lines fell "squarely in the category of hazards not attributable to any breach of duty on the part of Hatco" and hence the dismissal was correct.
In so ruling the trial judge relied heavily upon Wolczak v. National Electric Products Corp., 66 N.J. Super. 64 *543 (App. Div. 1961). We hold that case to be clearly inapposite. There plaintiffs injuries arose from a fall into a tank which occurred while he was in the process of drilling on an overhead steel beam, 7 1/2 inches wide, in connection with the installation of a monorail system to service the premises, and the issue was whether the owner, by its prior installation of tanks beneath the place where the work was to be done and leaving them uncovered, had violated its duty to provide plaintiff with a safe place in which to work. In this context it was held that the owner had breached no duty to Wolczak, an ironworker of 15 years' experience, where the maneuver attempted by him "was a not infrequent one in the ironworker's repertoire." (at p. 76). Compare Schwartz v. Zulka, 70 N.J. Super. 256, 263 (App. Div. 1961), modified on other grounds 38 N.J. 9 (1962); Hardman v. Ford Motor Co., 70 N.J. Super. 275, 286 (App. Div. 1961); certification denied 36 N.J. 299 (1962).
Here the hazard occasioned by the power line was neither incidental to nor a part of the construction of the water tank, and decedent's presence on the property bore no relation to it. See Reiter v. Max Marx Color & Chemical Co., 67 N.J. Super. 410, 413 (App. Div. 1960), affirmed 35 N.J. 37 (1961). Decedent was not a crane operator but a welder. He had no obligation with reference to the wires but was working under the orders of his superintendent, Ivan. Even had he been aware of the presence of wires overhead (of which there was no proof in the case) he would have had no knowledge that they carried the lethal charge testified to, and was not chargeable with such knowledge. See Stark v. Lehigh Foundries, Inc., 388 Pa. 1, 8, 130 A.2d 123, 128 (Sup. Ct. 1957). To all intents and purposes he could have concluded from their thickness that they were of low voltage and insulated. Cf. Beck v. Monmouth Lumber Co., supra, 137 N.J.L., at p. 275. On the other hand, Grace, on whose property and to whom the current was being furnished, was chargeable with knowledge of the *544 hazard which it posed, and was obligated to take such precautions as would have been reasonable under the circumstances to make the premises safe against the danger. Restatement, Torts (2d ed. 1965) § 343, pp. 215-16; Zentz v. Toop, supra, 92 N.J. Super. pp. 111-114. This is especially so where, as here, the attention of one not charged with operation of the crane would normally be directed to the work being performed by him rather than to the manner of its operation. Zentz v. Toop, supra., at pp. 114-15.
For the foregoing reasons the allowance of the motion for involuntary dismissal in favor of Grace was error.
Affirmed as to defendants Bethlehem and Public Service and reversed as to Grace (Hatco).
NOTES
[1] N.J.S.A. 34:6-47.5 was amended in 1966 to read:

"Whenever activity is to be performed requiring precautionary action under section 2 of this act, the employer, contractor or other person responsible for the activity shall, promptly notify the owner or person in charge of the high-voltage line of the intended activity and shall fully comply with and shall be responsible for the cost and for the completion of the precautionary action required under section 2 of this act before proceeding with such activity." (Emphasis added)