166 N.J. Super. 448 (1979)
400 A.2d 81
MARGARET JACKSON AND LARRY JACKSON, PLAINTIFF-APPELLANTS,
v.
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, P.E. ALBERT & SON, FORMERLY L. ALBERT & SON, BELLANCA CORPORATION, FORMERLY BELLANCA AIRCRAFT CORPORATION, AND OLSON BROTHERS, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 17, 1978.
Decided March 5, 1979.
*451 Before Judges LORA, MICHELS and LARNER.
Mr. Arthur M. Shara argued the cause for appellants.
Mr. Richard N. Catenacci argued the cause for respondent New Jersey Manufacturers Insurance Company (Messrs. *452 McElroy, Connell, Foley & Geiser, attorneys; Mr. William T. McElroy, of counsel and on the brief).
Mr. Daniel J. Keenan argued the cause for respondent P.E. Albert & Son.
Mr. Richard A. Levao argued the cause for respondent Bellanca Corporation and Olson Brothers, Inc. (Messrs. Shanley & Fisher, attorneys).
The opinion of the court was delivered by MICHELS, J.A.D.
Plaintiffs appeal from (1) a summary judgment in favor of defendant P.E. Albert & Son; (2) judgments of involuntary dismissal entered at the conclusion of their proofs in favor of defendants New Jersey Manufacturers Insurance Company (Manufacturers), Bellanca Corporation (Bellanca) and Olson Brothers, Inc. (Olson),[1] and (3) an order denying their motion for a new trial.
On or about October 25, 1973, Larry Jackson (hereinafter referred to as plaintiff) sustained a severe crushing injury to his hand while operating a rubber sheeting mill during the course of his employment with Waldon Roberts Rubber Company (Roberts). The rubber sheeting mill was manufactured and installed in the Roberts plant in Newark, New Jersey, by L. Albert & Son sometime in 1931  more than 42 years before the accident. Plaintiff instituted this action against defendants P.E. Albert & Son, Bellanca, Olson and Manufacturers seeking to recover damages for the personal injuries he sustained in the accident. His wife sued per quod. He claimed that at the time of the accident the mill should have been equipped with a point-of-operation guard and sought to impose tort liability upon P.E. Albert & Son, *453 Bellanca and Olson, as successors to L. Albert & Son, the manufacturer of the mill, on the theory that they failed to warn Roberts of "new, updated or improved safeguards desirable or required on equipment [the mill] in the field," and of the inherent danger and potential risks of the rubber mill as of 1973. Specifically, plaintiff claimed that L. Albert & Son as the manufacturer and installer of the mill, and these defendants, as its successors, should have known that point-of-operation safeguards were required to be on the mill at the time of the accident, and that they had a duty and ample opportunity prior to the accident to advise Roberts to install such safeguards. Plaintiff also contended that Manufacturers, as the workers' compensation insurance carrier for Roberts, was negligent in inspecting the rubber mill and in failing to notify Roberts of the hazardous condition of said mill and to require it to correct the condition and up-date the mill with effective point of operation safeguards.
Prior to trial the judge granted P.E. Albert & Son's motion for summary judgment on the ground that it was not a successor to L. Albert & Son and, therefore, was not liable for the tortious conduct, if any, of L. Albert & Son in connection with the manufacture and installation of the rubber mill. Thereafter, the matter was tried on the claims against Manufacturers, Bellanca and Olson. At the conclusion of plaintiff's proofs on liability, judgments of involuntary dismissal were granted in favor of each of these remaining defendants. The judge essentially held that plaintiff failed to prove a prima facie case of negligence against Manufacturers in that he did not show that Roberts relied upon Manufacturers' inspection of the plant and equipment, including the mill, in maintaining the equipment and proving for the safety of its employees. Additionally, the judge held that plaintiff failed to prove that either Bellanca or Olson violated any standard of care in regard to the manufacture and installation of the rubber mill and therefore did not prove a prima facie case against them. Plaintiff's motion for a new trial was denied, and this appeal followed.

*454 I.

Summary Judgment in Favor of P.E. Albert & Son
Plaintiff challenges the propriety of the grant of summary judgment in favor of P.E. Albert & Son. He claims that P.E. Albert & Son was formerly known as and is a successor to L. Albert & Son, and, therefore, is liable for the latter's tortious conduct, specifically its alleged failure to notify Roberts prior to the accident that point-of-operation safeguards should be installed on the rubber mill.
It is firmly established under our practice that a motion for summary judgment will be granted where the pleadings and affidavits or certifications do not show the existence of a genuine issue of material fact requiring disposition by a plenary trial. R. 4:46-2; Ruvolo v. American Cas. Co., 39 N.J. 490, 499 (1963); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75 (1954); Miller v. U.S. Fid. & Guar. Co., 127 N.J. Super. 37, 40-41 (App. Div. 1974). Here, the pleadings and certifications submitted in connection with the motion established that there was no genuine issue of material fact as to P.E. Albert & Son's status, and therefore summary judgment was appropriate for the disposition of the claim against it. See Miller v. U.S. Fid. & Guar. Co., supra.
The principle is well settled that where one company sells or otherwise transfers all of its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct, except where (1) the purchaser expressly or impliedly agrees to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuance of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape liability for such debts. McKee v. Harris-Seybold Co., 109 N.J. Super. 555, 561-562 (Law Div. 1970), aff'd o.b. 118 N.J. Super. 480 (App. Div. 1972). See also, Wilson v. *455 Fare Well Corp., 140 N.J. Super. 476, 484 (Law Div. 1976); Jackson v. Diamond T. Trucking Co., 100 N.J. Super. 186, 192 (Law Div. 1968); Menacho v. Adamson United Co., 420 F. Supp. 128 (D.N.J. 1976); 19 Am. Jur.2d, Corporations, § 1546 at 922-924 (1965); 15 Fletcher, Cyclopedia of the Law of Private Corporations (rev. perm. ed. 1973), § 7122 at 187.
The uncontroverted proofs show that in 1906 Louis Albert and Israel H. Albert formed a partnership under the name of L. Albert & Son. Thereafter, on or about October 1, 1943, Philip E. Albert, a son of Israel H. Albert, became a partner in L. Albert & Son. In 1944 Israel H. Albert died. Sidney Albert, another son of Israel H. Albert, who also had earlier been made a partner in the firm, bought the entire interest of all of the other partners in 1955, including Philip E. Albert, and thereupon became the sole owner of the business. In 1956 Sidney Albert caused L. Albert & Son to be merged with Bellanca Aircraft Corporation (which became Bellanca Corporation), and L. Albert & Son became a division of Bellanca. The proofs further established that Philip E. Albert was employed by L. Albert & Son, Division of Bellanca, until 1958, when Bellanca liquidated this division. Philip E. Albert resigned from Bellanca at that time and started his own business under the name of Philip E. Albert, trading as P.E. Albert & Son. Sometime in the latter part of 1958 he purchased from Bellanca some of the inventory and fixed assets of its L. Albert & Son Division. He did not acquire the right to use the name "L. Albert & Son," said name being retained by Bellanca. Moreover, there was no proof that Philip E. Albert expressly or impliedly agreed to assume the debts or obligations of the L. Albert & Son Division when he purchased some of its inventory and fixed assets from Bellanca.
In the circumstances it is clear that P.E. Albert & Son was not formerly L. Albert & Son, and was not and is not a successor to that partnership. P.E. Albert & Son is a separate and distinct business entity which did not come *456 into existence until 1958  more than 27 years after the manufacture and installation of the rubber mill at the Roberts plant by L. Albert & Son. Consequently, liability cannot be visited upon P.E. Albert & Son for any alleged tortious wrong doing of L. Albert & Son or its successors, and thus, P.E. Albert & Son is not liable for the injury sustained by plaintiff while operating the mill.
Accordingly, the summary judgment in favor of P.E. Albert & Son is affirmed.

II

Judgment of Involuntary Dismissal of Claim Against Manufacturers.
Plaintiff's claim against Manufacturers is grounded upon the latter's alleged negligent inspection of the Roberts plant, particularly the rubber mill involved in this accident, and Roberts' alleged reliance upon such inspection in maintaining the machinery in an up-to-date and safe condition and in providing for the safety of its employees. Plaintiff alleged in his amended complaint that Manufacturers, which had issued a workers' compensation insurance policy to Roberts, was negligent in inspecting the rubber mill, particularly by its failure (1) to notify Roberts of the mill's hazardous condition and (2) to require Roberts to correct the condition and install effective point-of-operation guards. He claimed that Manufacturers' negligence was a proximate cause of the accident and resultant injury sustained by him, and therefore Manufacturers was liable under the principles discussed in Viducich v. Greater N.Y. Mut. Ins. Co., 80 N.J. Super. 15 (App. Div. 1963), certif. den. 41 N.J. 129 (1963). On this appeal plaintiff contends that he presented sufficient evidence to warrant submitting the case against Manufacturers to the jury, and thus the court erred in granting Manufacturers' motion for a judgment of involuntary dismissal.
*457 In ruling on a motion for involuntary dismissal at the conclusion of a plaintiff's proofs on liability, the scope of a court's responsibility and function is well defined.
In the case of motions for involuntary dismissal, the test is * * * whether `the evidence, together with the legitimate inferences therefrom, could sustain a judgment in * * * favor' of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. [Citations omitted]. The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion. [Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969)]
Our study of this record satisfies us that plaintiff did not present sufficient credible evidence to present a prima facie case against Manufacturers, and therefore the judge did not err in granting this defendant's motion for a judgment of involuntary dismissal.
The legal principles governing the imposition of tort liability against one in Manufacturers position are set forth in Restatement, Torts 2d, §§ 323, 324A (1965), and have been followed by this court. See Viducich v. Greater N.Y. Mut. Ins. Co., supra (adopting equivalent section of Restatement, Torts (First)).
Section 323 of the Restatement, Torts 2d (1965), provides:

§ 323. Negligent Performance of Undertaking to Render Services.
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.
*458 Section 324A, which parallels the rule set forth in Section 323, provides:

§ 324A. Liability to Third Person for Negligent Performance of Undertaking.
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Reliance on the part of the insured is a basic and necessary prerequisite to the imposition of liability under the principles discussed above in §§ 323 and 324A of the Restatement. Viducich v. Greater N.Y. Mut. Ins. Co., supra 80 N.J. Super. at 23. See Evans v. Liberty Mut. Ins. Co., 398 F.2d 665, 667 (3 Cir.1968). Here, plaintiff failed to prove that Roberts relied upon Manufacturers' annual inspections of its plant and machinery "to keep up-to-date with changing safety standards in the rubber mill industry." Quite the contrary, plaintiff's proofs affirmatively showed that although Manufacturers made yearly inspections of the Roberts plant prior to renewing its workers' compensation policies (and, incidentally, following the occurrence of accidents in the plant), Roberts did not rely upon these inspections in meeting its responsibility to provide for the safety of its employees. Clarence J. Alexander, Roberts' plant superintendent, testified on plaintiff's case that the plant had a safety committee whose function it was to implement safety rules for the plant. This committee had the specific responsibility to ensure that no operator removed the guards from the machines or operated any machines without guards. Alexander expressed the view that plant safety was a 24-hour-a-day operation, and affirmatively stated that neither *459 he nor the safety committee relied upon Manufacturers' yearly inspections in maintaining plant safety. Furthermore, Alexander had the authority to decide what guards were to be on the machines, and testified that he made these determinations without relying upon any recommendations or suggestions from Manufacturers. Alexander stated that had Manufacturers recommended or suggested the installation of a pressure sensitive bar on the rubber mill (which plaintiff's expert recommended in his report), he would not have installed it. The proofs corroborate this testimony in that they show Alexander did not follow many of the recommendations or suggestions made by Manufacturers.
Beyond this, there is no proof in this record that Manufacturers had "undertaken" to make a safety inspection of the entire Roberts plant, or that it was under a contractual obligation to do so. The responsibility for plant safety rested solely with Roberts, its plant superintendent Alexander, and the plant safety committee, and there is nothing in the insurance contract entered into between Manufacturers and Roberts from which it could reasonably be concluded that Roberts had the right to rely upon Manufacturers' yearly pre-renewal inspections in fulfilling its responsibility to provide for the safety of its employees. The right of Manufacturers to inspect the Roberts plant was reserved under its insurance policy, which, in pertinent part, provided:
The company and any rating authorities having jurisdiction by law shall be permitted, but not obligated, to inspect at any reasonable time, work places, operations, machinery and equipment covered by this policy; neither the right to make inspections nor the making thereof, nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the insured or others to determine or warrant that such work places, operations, machinery or equipment are safe or helpful or in compliance with any law, rule or regulation.
In the circumstances we are in complete accord with the trial judge's holding that plaintiff failed to show that Roberts relied upon the annual inspections by Manufacturers *460 for plant safety, and, thus, failed to prove an essential element of the case against Manufacturers.
Finally, we have read carefully and considered the case of Van Winkle v. American Steam Boiler Co., 52 N.J.L. 240 (Sup. Ct. 1890), upon which plaintiff has relied. We are satisfied that the Van Winkle case is plainly distinguishable and does not require us to reach a different conclusion. See Viducich v. Greater N.Y. Mut. Ins. Co., supra, 80 N.J. Super. at 19-22, wherein this court analyzed and distinguished from the Van Winkle case a case somewhat factually similar to the within appeal.
Accordingly, the judgment of involuntary dismissal in favor of Manufacturers is affirmed.

III

Judgment of Involuntary Dismissal of Claim Against Bellanca and Olson.

A
The main thrust of plaintiff's attack upon the judgment in favor of Bellanca and Olson relates to the trial judge's refusal to permit his expert to testify as to the allegedly defective condition of the mill. Plaintiff's expert, a consulting engineer, submitted a report in which he expressed the opinion that the mill was defective because it was not equipped with a point-of-operation safeguard at the time of the accident, and that "[t]he manufacturer was negligent in not advising its customer of new, updated or improved safeguards desirable or required on equipment in the field." His report made reference to the development of safety standards in the industry and concluded, in part, by stating:
* * * The long and well-known history of rubber and plastics mill safety standards, then, existed well before the date of the accident (10/25/73). The manufacturer had ample opportunity to advise customers with existing installations of the considerable and continuing progress in the safeguarding of mill operators through effective point-of-operation *461 safeguarding means intended to provide for the safety of life or limb and property.
During his voir dire examination at trial the expert testified that he relied upon the safety standards for mills in the rubber and plastics industry established by the American National Standards Institute (ANSI), and that these standards are identical to and incorporated by reference in the regulations promulgated by the Occupational Safety and Health Administration (OSHA) pursuant to the Occupational Safety and Health Act, 29 U.S.C.A. § 651 et seq. While the expert conceded that the mill had a safety triprod an required by § 1910.216(b) (2) (ii) of the OSHA regulations,[2] he expressed the opinion that the standards established by ANSI and OSHA were deficient and, in any event, he interpreted these standards to require more than the safety triprod referred to in § 1910.216(b) (2) (ii).
The judge held that the OSHA regulations established as a matter of law the standard of care to be followed in this case and interpreted the OSHA regulations to require the installation of only one guard on the machine. The judge, finding compliance with the relevant OSHA regulation, refused to permit plaintiff's expert to testify that the mill was defective. We are of the view that this ruling was erroneous. The OSHA regulations did not establish as a *462 matter of law the standard of care applicable to these defendants. In the first place, the OSHA regulations, and the ANSI code which was incorporated therein, see 29 C.F.R. § 1910.221, place the duty of providing safeguards for the mill devolved upon plaintiff's employer  not the manufacturer of the mill. See Murphy v. L. & J. Press Corp., 558 F.2d 407, 411-412 (8 Cir.1977), cert. den. 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). Plaintiff's employer was not a party to this action, and thus the compliance or noncompliance with the OSHA regulations by the employer was irrelevant. Secondly, neither the OSHA regulations nor the ANSI code was in existence when this mill was manufactured and installed in the Roberts plant by L. Albert & Son, and, therefore, neither would have been properly admissible to establish the appropriate standard of care in support of plaintiff's negligence claim against the manufacturer and its successors. Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152, 193 (1978). See also, Vroman v. Sears, Roebuck & Co., 387 F.2d 732, 737-738 (6 Cir.1967); Franklin v. Skelly Oil Co., 141 F.2d 568, 572 (10th Cir.1944). Finally, even if the OSHA regulations and the ANSI code arguably were relevant, the mere compliance with them does not preclude a finding of negligence if there is competent proof that a reasonable manufacturer would have taken additional precautions. The law is clear that compliance with a legislative enactment, administrative regulation or industrial safety code, while evidential, is not conclusive as to the nonnegligence of a manufacturer or the absence of a defect in a machine. Cepeda v. Cumberland Engineering Co., Inc., supra, 76 N.J. at 193; McComish v. DeSoi, 42 N.J. 274, 283-285 (1964); Torsiello v. Whitehall Laboratories, 165 N.J. Super. 311, 326, n. 4 (App. Div. 1979); Manning v. Public Service Elec. & Gas. Co., 58 N.J. Super. 386, 395 (App. Div. 1959), overruled on other grounds. Black v. Public Service Elec. & Gas Co., 56 N.J. 63, 79 (1970). See also, Bruce v. Martin-Marietta Corp., 544 F. 442, 446 (10 Cir.1976); Hubbard-Hall *463 Chemical Co. v. Silverman, 340 F.2d 402, 405 (1 Cir.1965); Burch v. Amsterdam Corp., 366 A.2d 1079, 1085 n. 17 (D.C. App. 1976); Berkebile v. Brantly Helicopter Corp., 219 Pa. Super. 479, 281 A.2d 707, 710 (Super. Ct. 1971); Restatement, Torts, 2d, § 288C (1965).
Thus, the trial judge should have permitted the expert witness to testify as to safety standards for the mill even though his opinion may have conflicted with the standard established by OSHA. The expert witness still could have expressed an opinion as to safety standards based upon recognized engineering principles or his knowledge of industry standards.

B
Even though the judge's evidentiary ruling may have been erroneous, in the context of this case we are firmly convinced that it was not prejudicial and does not mandate reversal of the judgment in favor of Bellanca and Olson. The proffered opinion would not have established a prima facie case against defendants under any recognized theory of tort liability. In the first place, assuming that plaintiff's amended complaint can be broadly read as asserting a cause of action under principles of strict liability in tort, the proffered evidence was insufficient to take the case to the jury on such a theory. To invoke this doctrine it is essential to prove that the product  here the mill  was defective when it left the seller's hands and was placed in the stream of commerce. Cepeda v. Cumberland Engineering Co., Inc., supra, 76 N.J. at 193; Lynch v. Galler Seven-Up Pre-Mix Corp., 74 N.J. 146, 152 (1977); Herbstman v. Eastman Kodak Co., 68 N.J. 1, 7-8 (1975); Moraca v. Ford Motor Co., 66 N.J. 454 (1975); Scanlon v. General Motors Corp., 65 N.J. 582, 590 (1974). Comment (g), Restatement, Torts 2d, § 402A, which applies to any cause of action generically labeled as strict liability in tort, buttresses the view our courts consistently have taken in this regard, that proof of a defect and ensuing, causally-related injury, without *464 a showing that the defect existed while the product was in the seller's control, is insufficient to make out a prima facie case of liability.
g. Defective condition. The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained. Safe condition at the time of delivery by the seller will, however, include proper packaging, necessary sterilization, and other precautions required to permit the product to remain safe for a normal length of time when handled in a normal manner. [Emphasis added]
See generally, Annotation, "Products Liability: Proof, Under Strict Tort Liability Doctrine, That Defect Was Present When Product Left Hands of Defendant," 54 A.L.R.3d 1079 (1974).
Thus, plaintiff had to show that, as of 1931 when the mill was manufactured and installed in the Roberts plant, there was either a manufacturing defect, a design defect, or a defect in the nature of a failure to warn. It is perfectly clear that plaintiff's expert witness was not prepared to testify as to the existence of either a manufacturing or a design defect as of 1931, and there was no other evidence in the case to prove this essential fact. The expert witness' opinion, as appears from his written report and voir dire examination, referred only to a design defect at the time of the accident, not when the mill was manufactured. His opinion that such a defect existed was based upon standards established more than 20 years after the machine was manufactured. He relied in part on relevant OSHA regulations and portions of the ANSI code (which were not in existence when this machine was manufactured), in part on his knowledge of the state of the art (which also developed after the machine was *465 manufactured), and upon his personal view of what would be acceptable for the safe operation of this machine. In the circumstances, we are satisfied that this testimony would not have established a prima facie case of either a manufacturing or a design defect within the principles set forth in Restatement, Torts, 2d, § 402A (1965), and discussed in Cepeda v. Cumberland Engineering Co., Inc., supra, 76 N.J. at 169-170, and Bexiga v. Havir Manufacturing Corp., 60 N.J. 402 (1972).
Further, the proffered testimony would not have supported the claim made by plaintiff that these defendants, as successors of the manufacturer, were negligent in failing to notify the customer, Roberts, of "new, updated or improved safeguards desirable or required" for the mill. There is no duty upon the seller of a machine faultlessly designed and manufactured, such as this mill, to notify its customers after the time of sale of changes in the state of the art concerning the safe operation of such machine and advise them to install any new, updated or improved safeguards developed since the time of sale. Whether this claim, essentially one of failure to warn, is viewed as sounding in negligence, see Restatement, Torts, 2d, § 388, or strict liability, see id., § 402A, Comment (j), makes no difference. As this court recently stated in Torsiello v. Whitehall Laboratories, supra:
We are satisfied that where the "defect" of a product is in the failure of an appropriate accompanying warning as to use rather than in a design or manufacture defect, the action is equally sustainable under § 388 of the Restatement, Torts 2d and under Sec. 402A. See, e.g., Sterling Drug, Inc. v. Yarrow, 408 F. 2d 978, 992 (8th Cir.1969), a prescription drug case, holding that the gist of the cause of action based on an alleged inadequate warning is the same under both Section 388 and 402A. And see, also, Rainbow v. Albert Elia Building Co., Inc., 49 A.D.2d 250, 373 N.Y.S.2d 928 (App. Div. 1975), expressly holding that precisely the same matters must be established in a negligence action as in a strict liability action where the injury is attributed to the failure to warn. [165 N.J. Super. at 320, n. 2]
Moreover, our use of the phrase "failure of an appropriate accompanying warning" (emphasis added) in Torsiello is *466 merely a reflection of the general principle embodied in Comment (g) to § 402A that the "defect," be it one of manufacture, design or failure to warn, must be in existence at the time the product is placed in the stream of commerce. Consequently, the failure of these defendants to notify Roberts of changes in safety standards for the mill, cannot result in the imposition of liability upon them. The obligation to maintain the mill in a safe condition must rest with the customer.[3]

IV

Denial of Motion for a New Trial
Plaintiff also argues that the trial court erred in denying his motion for a new trial. From our study of the record in the light of the arguments advanced and in view of our holdings above, we conclude that the denial of the new trial motion was not a manifest denial of justice.
Affirmed.
NOTES
[1] On November 30, 1961 Bellanca Corporation, which was formerly Bellanca Aircraft Corporation, having acquired all of the outstanding stock in various companies owned by C.D. and H.G. Olson, changed its name to Olson Brothers, Incorporated.
[2] 29 C.F.R. § 1910.216 pertaining to "Mills and calendars in the rubber and plastic industries," provides in pertinent part:

* * * * * * * *
(b) Mill safety controls  (1) Safety trip control. A safety trip control shall be provided in front and in back of each mill. It shall be accessible and shall operate readily on contact. The safety trip control shall be one of the following types or a combination thereof:
* * * * * * * *
(ii) Safety triprod. Installed in the front and in the back of each mill and located with 2 inches of a vertical plane tangent in the front and rear rolls. The top rods shall be not more than 72 inches above the level on which the operator stands. The triprods shall be accessible and shall operate readily whether the rods are pushed or pulled.
[3] We recognize that there are products liability cases from other jurisdictions which speak of a manufacturer's or seller's "continuing duty to warn." See 1 Frumer & M. Friedman, Products Liability § 8.02 (1978); see, generally, Prosser, Torts (4 ed. 1971), § 96 at 646-647 n. 67. Our review of these cases leads us to conclude that this phrase has been used most often to describe no more than the obligation imposed where a manufacturer or seller, believing that it has sold a non-defective product, subsequently learns that its product was in fact, defective when placed in the stream of commerce. In these circumstances, saying that there is a "continuing duty to warn" is of course, a tacit recognition that the duty existed in the first instance. Such an obligation is not at all synonymous, however, with the claim  made here by plaintiff  that where a product is free from all defects when sold, the seller, nevertheless, has a duty to monitor changes in technology and notions of safety and, either periodically or otherwise, notify its purchasers thereof. For where, as here, no initial duty to warn exists, none can be said to "continue." Cf. Torsiello v. Whitehall Laboratories, supra, 165 N.J. Super. at 328 (manufacturer's duty to warn is primary and "continuing" in the sense that the manufacturer "cannot, as a matter of law, be automatically insulated or exculpated because of another's subsequent negligent act").