234 N.J. Super. 353 (1989)
560 A.2d 1261
ANTHONY BOTTIGNOLI AND LUCILLE BOTTIGNOLI, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
ARIENS COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 11, 1989.
Decided July 13, 1989.
*354 Before Judges PRESSLER, O'BRIEN and STERN.
Adrian I. Karp argued the cause for appellants.
J.R. Peter Wilson argued the cause for respondent (McGuire and Wilson, attorneys).
The opinion of the court was delivered by STERN, J.A.D.
Plaintiffs appeal from a judgment based on a verdict of no cause for action and from the denial of their motions for judgment n.o.v. and new trial.[1] We affirm.
*355 The fingers of plaintiff Anthony Bottignoli (hereinafter plaintiff) were severely injured when he endeavored to clear snow from the chute of a snowblower manufactured by defendant. After trial the jury, in response to special interrogatories, concluded that defendant had not designed the snowblower defectively nor failed to give adequate warnings of its danger. We find no basis for disturbing the verdicts or the denial of plaintiffs' motions for judgment n.o.v. or new trial.
The snowblower was manufactured by defendant in 1965, and plaintiff, a carpenter, bought it from one of his customers in January 1985. At the time of sale, the seller no longer had the owner's manual for the snowblower in her possession. Plaintiff therefore never reviewed it.
Plaintiff first used the snowblower on February 6, 1985. He had never used any type of snowblower before. During the first five minutes of use the chute through which the snow was expelled became "clogged," and plaintiff twice "vibrated" and "bounced" the machine in an attempt to "jar loose" the snow, and "wiped it with my hand." However, the third time the chute became clogged, this remedy did not work. Therefore, plaintiff put the machine in "neutral and park," thereby causing its wheels to stop rolling. However, he did not turn the motor off, and the engine continued to run.[2] Hence, the blades inside the chute continued to spin at 1,100 revolutions per minute. Plaintiff then reached his ungloved left hand into the chute to clean out the clogged snow. After removing some of the snow, plaintiff's fingers were "grabbed" by the spinning blades causing severe injuries. Ultimately parts of three fingers were amputated.
It was undisputed that there was no guard over the chute opening. There was, however, a decal on the chute which read: "Caution, stop engine before removing obstructions from blower or rake." Though plaintiff saw the decal, he testified that he *356 understood the word "obstruction" to refer to "when you ran over something, a piece of branch or whatever." He testified that he did not consider snow to be an "obstruction", and that he did not understand that he was risking injury by putting his hand into the chute. Rather, plaintiff assumed that, by putting the traction in park and the shift lever in neutral, the blades in the chute "would stop" too. During his initial attempt to clear the clog he did not see that the blades were still spinning in the chute. Nonetheless, he admitted that after he stopped the blower and placed it in park he could "hear the thing turning."
According to plaintiff's expert, Richard Schwarz, a mechanical engineer, the industry standard in 1965 was to guard the chute opening with an M-shaped wire, which would fit into the opening of the chute, thereby blocking a hand from coming in contact with the impelling blades. Schwarz testified that had the blower been equipped with an "M guard," plaintiff's "hand could not have gone in deep enough to have been hit by the rotating blades." Schwarz also testified that defendant failed to include "a deadman's clutch," another available safety device by which the engine and impelling blades "would be cut off" whenever the operator took his hands off the handle.
According to Schwarz, plaintiff had three means of stopping the blades without turning off the engine on his machine:
One was the clutch, which would disengage the blades. Two, the clutch which would disengage the traction and therefore cut power to the blades. The third would be the throttle which would be put in the stopped position.
In Schwarz's opinion, none of those three methods served as a reasonable substitute for an M guard or deadman's clutch because each required the operator to "leave its position" or disengage the blades by some affirmative act. Schwarz did testify, however, that the accident would not have occurred if plaintiff had chosen any of the three available options. Schwarz further testified that while defendant had incorporated a deadman's clutch in some models built before 1965, it did not become required by industry standards until 1975.
*357 Warnings were, however, required as an industry standard by 1965. According to Schwarz, the cautionary decal on plaintiff's machine was not adequate because it failed to inform users that their fingers could be cut if they inserted their hands in the chute. He stated that "[s]tronger wording including a pictorial view of rotating blades and fingers being chopped off" was necessary to be adequate. Schwarz further concluded that defendant had a duty, after the guard standards were formally adopted in 1975, to make "post-sale warnings" to the public through the media, designed to warn prior purchasers of the dangers similar to those encountered by plaintiff.[3] The failure to give such a warning, Schwarz testified, constituted a deviation from standard engineering practice. However, he was not aware of any manufacturers who provided this type of retroactive warning.
Defendant's Vice President of Engineering during the pertinent time, Willard Tschantz, testified for defendant. Tschantz, a mechanical engineer who supervised the design of defendant's 1960 and 1965 snowblower models, stated that there were no industry standards relating to the design or manufacture of snowblowers in 1960 or 1965. Nevertheless, defendant's 1960 model included a deadman's clutch "with a lockout which really could defeat the purpose of a dead man clutch." However, customers did not like this feature because there was no way to stop the forward motion without stopping the blower, thus preventing self-cleaning. Accordingly, the machine was redesigned by 1965 without a deadman's clutch.
According to Tschantz, the first industry standards were formally adopted in 1975 by the subcommittee of the American National Standards Institute ("ANSI") of which he was chairman. Tschantz testified that both the deadman's clutch and the M guard had been known since the 1800's, and that both could *358 have been employed on the 1965 unit. However, Tschantz felt that the warnings in the owner's manuals and on the decals on the chutes were adequate. He also felt that snow clearly qualified as an "obstruction" within the meaning of the decal.
Defendant's expert witness, Gilbert Buske, also a mechanical engineer, concluded that defendant's decision to remove the deadman's clutch after the 1960 design was "very reasonable" because it "didn't work very well on the snow throwers." He confirmed that there were no industry standards for snowblowers until the ANSI standards were adopted in 1975, and that M guards were not used on snowblowers until 1967. Buske opined that, "within a reasonable degree of scientific probability," plaintiffs' snowblower was properly designed. He based that opinion on his knowledge of snowblowers and of the snowblower industry, and his own experience with the 1965 model, which he owned for his personal use. Buske also concluded that defendant's decal was adequate in warning of danger. According to Buske, had plaintiff followed the caution on the decal, he would not have been injured.

I.
Plaintiffs complain that the trial court committed plain error in failing to instruct the jury, during its charge, that the issue of comparative fault had been removed from the case. Plaintiffs also argue that the omission was prejudicial because the jury was directed to make a finding on "[f]actor[] ... 5" of the "risk-utility analysis" relating to the user's ability to avoid injury by using due care, an issue plaintiffs believe the jury perceived to be akin to comparative fault.
At the close of all testimony plaintiffs successfully moved to strike the defense of comparative negligence in the absence of adequate proof that plaintiff had "actual knowledge" of danger with respect to the snowblower, and "voluntarily encountered that risk." As a consequence, before summations the judge instructed the jury

*359 I want to advise you that you have heard some statements here with regard to Mr. Bottignoli's comparative fault. I want you to know that his comparative fault has been removed from your consideration and for that reason you are not to consider it at all. You'll see that later on when I charge you, but you should know that in advance. (emphasis added).
However, in his final charge to the jury the judge did not specifically mention comparative negligence or repeat this instruction. He did say:
During the course of this trial the Court has ruled on certain objections of Counsel. It is not only their right, but a sworn duty on the part of Counsel to make such objections. The rulings of the Court on these objections are not to be taken as prejudicing either party. They are based solely on matters of law addressed to the Court and should not enter your consideration of this case. You must exclude from your deliberations any manner  any matter, rather, or testimony which I have excluded. (emphasis added).
The judge then charged that in deciding whether the snowblower was defectively designed, the jury had to apply the "risk-utility analysis," the elements of which he explained in detail. One such element, referred to by plaintiffs as "factor" five, was "the ability of foreseeable users to avoid danger by the exercise of care in the use of the snow blower." See, e.g., Cepeda v. Cumberland Engineering Co., 76 N.J. 152, 174 (1978). See also O'Brien v. Muskin Corp., 94 N.J. 169, 184-188 (1983); Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 171-177 (1979).
Plaintiffs objected to the charge, stating:
Judge, I have one concern, that is that the latter part of your charge when you were telling them one and one is two and that you're not limited to the proofs and you can draw inferences and then you said something almost identical to that just now in concluding, that they are going to override the admonition you gave them earlier that you had ruled out comparative fault.
* * * * * * * *
And I think you ought to go back to that because I think that they're going to think that it's okay to go into it.
Thereafter the judge proposed to "repeat for the jury that they are not to consider anything that I have instructed them to exclude from their consideration," to which plaintiffs' counsel responded, "[o]kay. That's fair." Accordingly, the judge gave the following curative charge:

*360 Ladies and gentlemen of the jury, let me stress something that I've told you before, just to highlight it, and that is that you, the members of the jury, are not to consider anything that I have excluded from your consideration.
In his post-verdict motion for judgment n.o.v. or for a new trial, counsel for plaintiffs argued, among other things, that the judge's charging of factor five was inconsistent with his barring of the comparative-fault defense, in that it effectively invited the jury to consider the excluded defense. Counsel conceded that he had "missed the boat" by not objecting to the charge or to the judge's failure to give his promised explanation of the comparative-fault ruling. The trial judge denied the motion, stating that while he "most likely" would have concluded otherwise as fact finder, he had no authority to second-guess the verdict. With respect to the comparative-negligence issue, the judge further noted both plaintiffs' counsel's failure to object and that the judge's own curative charge made with the consent of counsel. He concluded:
This Court is at a loss to comprehend how the jury was confused or misled as to the issue of comparative negligence. Certainly, it was proper to charge the jury as to the risk-utility factor going to Plaintiff's conduct. Certainly, the jury could have, and apparently did, give substantial weight to this factor in its risk-utility determination that the snowblower in question was not defectively designed. While Plaintiffs' Counsel's dissatisfaction with this outcome is quite understandable, the jury charge did not mislead the jury and in no way resulted clearly and convincingly in a manifest denial of justice.
We agree with the conclusions of the trial judge in denying the post judgment motions. Neither the trial judge nor this court has authority to "second guess" the jury's determination, expressed in answers to special interrogatories, that the snowblower was not "defectively designed" and that defendant's warning to consumers in 1965 was "adequate and effective." Further, while defendant does not expressly contend that the trial judge erred in concluding that comparative negligence or fault was not an issue in the case, and while we do not address the issue on the merits in any way, cf. Rivera v. Westinghouse Elevator Co., 107 N.J. 256, 260-261 (1987); see also Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 562-64 (1980); M and Wife v. Schmid Laboratories, Inc., 178 N.J. Super. *361 122, 126 (App.Div. 1981),[4] we note that any error in the judge's ruling was harmless to plaintiff.
We conclude that the trial judge adequately responded to plaintiffs' specific objection related to the perceived inconsistency between the dismissed defense of comparative fault and the risk-utility factor relating to the user's ability to avoid danger. We therefore find no plain error in the judge's instructions warranting reversal. Cf. Gaido v. Weiser, 227 N.J. Super. 175, 200-201 (App.Div. 1988), aff'd o.b., 115 N.J. 310 (1989). Compare, Siren v. Behan, 224 N.J. Super. 130, 138-142 (App.Div. 1988) remanded o.g., 113 N.J. 323 (1988).

II.
Plaintiffs contend that they were entitled to a judgment on liability because defendant breached its continuing duty either to warn all users of the danger or to "retrofit" the units with devices to eliminate the hazard. This issue was raised in support of their motion for judgment at the close of all the evidence, which motion was denied. While plaintiffs did not request a jury charge on this point, the subject was again raised on the motion for judgment n.o.v. or new trial.[5]
We reject plaintiffs' contention that it is "the law of this State that the manufacturer of a defective product has a continuing duty to protect a purchaser, even where a defect is discovered after the sale." While the proposition has been endorsed by at least one member of our Supreme Court, Stephenson v. R.A. Jones & Co., 103 N.J. 194, 216 (1986) (Stein, J., dissenting), the present state of the law is now otherwise in this particular context. See Feldman v. Lederle Laboratories, 97 N.J. 429, 456-57 (1984) for the general proposition. As we said in Jackson v. New Jersey Manufacturers Insurance Co., *362 166 N.J. Super. 448 (App.Div. 1979), certif. denied, 81 N.J. 330 (1979), relating to a similar issue:
There is no duty upon the seller of a machine faultlessly designed and manufactured ... to notify its customers after the time of sale of changes in the state of the art concerning the safe operation of such machine and advise them to install any new, updated or improved safeguards developed since the time of sale. [166 N.J. Super. at 465].[6]
Further, we said in Jackson that the alleged defect
must be in existence at the time the product is placed in the stream of commerce. Consequently, the failure of these defendants to notify Roberts of changes in safety standards for the mill, cannot result in the imposition of liability upon them. The obligation to maintain the mill in a safe condition must rest with the customer. [Id. at 466 (emphasis in original)].[7]
Thus, we reject plaintiffs' contention that existing New Jersey law requires a manufacturer, who manufactures a product which conforms to industry safety standards, to warn purchasers when those standards are subsequently updated. We view a situation in which design standards are updated to be different from discovery that a product believed to be safe actually had a latent danger or design defect before sale. Compare, Feldman v. Lederle Laboratories, supra. See also Hayes v. Ariens Co., 391 Mass. 407, 462 N.E.2d 273, 276-277 (1984) (involving defendant's 1961 snowblower, which carried the same warning label *363 as was on the 1965 model in this case)[8]; Gauthier v. AMF, Inc., 788 F.2d 634, 637-638 (9th Cir.1986), amended and reh'g denied, 805 F.2d 337 (9th Cir.1986) (evidence of subsequent design changes to snowblower inadmissible).
Finally, as the complaint in this case was filed before July 22, 1987 and in the absence of any argument under the Products Liability statute, N.J.S.A. 2A:58C-1, et seq., we do not consider any statutory issue in this case. See N.J.S.A. 2A:58C-4; L. 1987, c. 197, § 8 (effective date).

III.
The evidence in this case included testimony by Buske and Tschantz that in 1965 industry standards did not require an M guard or a deadman's clutch, and that the 1965 model was properly designed. While plaintiffs' expert offered a contrary opinion, the jury was entitled to reject it. Similarly, there was evidence from which the jury could have found that the cautionary decal on the 1965 model provided an adequate warning as to the danger presented by the blades. Further, as the trial judge noted during trial and on the post-judgment motions, there were fact questions for the jury to decide under the risk-utility analysis. While the judge may well have disagreed with the jury's findings if he were the fact finder, his role upon deciding the post-judgment motions was only to consider whether reasonable persons could disagree as to the result. See, e.g., Dolson v. Anastasia, 55 N.J. 2, 5 (1969).
We agree with the trial judge that there was no basis for entering a judgment for plaintiffs as a matter of law and no basis for granting their motion for new trial.
Affirmed.
NOTES
[1] The notice of appeal is directed exclusively to the order of September 2, 1988 which denied plaintiffs' motions for judgment n.o.v. and new trial. The judgment was entered on behalf of defendant on August 16, 1988, and given the issues, we treat the appeal as if from the judgment as well.
[2] Plaintiff acknowledged that he "didn't stop the engine."
[3] Schwarz referred to the possibility of a recall or news coverage to protect persons, like plaintiff, who were not direct purchasers.
[4] The complaint in this case was filed before July 22, 1987, and neither party claims that the Products Liability statute, N.J.S.A. 2A:58C-1, et seq., controls. See N.J.S.A. 2A:58C-3. See also L. 1987, c. 197 § 8 (effective date).
[5] See fn. 1 supra.
[6] In Stephenson, Justice Stein cited only one New Jersey case  Jackson, 166 N.J. Super. at 466 n. 3  in support of the proposition that a manufacturer owed such a continuing duty of protection. In Jackson, plaintiff's hand was crushed in 1973 by a rubber sheeting mill manufactured in 1931. Evidence proffered by plaintiff would have showed that the mill was not defective at the time of its manufacture, but that as the state of the art developed about twenty years later, design and safety standards required installation of a guard on this type of mill. The trial court held this evidence inadmissible, and we affirmed.
[7] In the Jackson footnote cited by Justice Stein in Stephenson, supra, we recognized that cases from other jurisdictions had imposed on manufacturers a "continuing duty to warn" where there was subsequent discovery of a defect at the time the product was "placed in the stream of commerce." 166 N.J. Super. at 466 n. 3. However, in the same footnote, we distinguished those cases from cases where the product was not defective at the time of sale.
[8] Accordingly, we do not consider any distinctions between direct and remote purchasers. In Hayes the plaintiff, like this plaintiff, was a remote purchaser, but that fact was not controlling. Of significance, the jury found no breach of warranty.