270 N.J. Super. 569 (1994)
637 A.2d 915
KENNETH DIXON, PLAINTIFF-APPELLANT,
v.
JACOBSEN MANUFACTURING COMPANY, JACOBSEN DIVISION OF TEXTRON, INC., HOMELITE DIVISION OF TEXTRON, INC., TEXTRON, INC., JOHN DOE AND XYZ CORPORATION, SAID NAMES BEING FICTITIOUS, DEFENDANTS-RESPONDENTS,
v.
RICHARD P. DIXON AND NANCY J. DIXON, THIRD PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1993.
Decided February 2, 1994.
*574 Before Judges STERN, KEEFE and BILDER.
Jeffrey R. Youngman argued the cause for appellant (Karas, Kilstein, Hirschklau, Feitlin, Kopf & Baime, attorneys).
Dana C. Argeris argued the cause for respondent (Carton, Witt, Arvanitis & Bariscillo, attorneys).
The opinion of the court was delivered by KEEFE, J.A.D.
The primary issue presented on this appeal is whether a manufacturer, who knows the identity of the current owner of a consumer product it manufactured several years earlier, has a duty upon inquiry to provide the current owner with more specific and clearer instructions adopted by it after the date of manufacture concerning safe use of the product. We conclude under the facts of this case that such a duty exists, and a jury question was presented concerning a breach of that duty. We also conclude that the trial judge improperly excluded relevant evidence bearing on that issue. Thus, the judgment in favor of defendant on the *575 warning defect issue is reversed and the matter is remanded for a new trial in accord with this opinion.
On January 22, 1987, plaintiff Kenneth Dixon, then 16 years old, severed three fingers when he placed his left hand into the discharge chute of a snowthrower[1] manufactured in 1965 by defendant Jacobsen Manufacturing Company (Jacobsen).[2]
In the fall of 1986, plaintiff's father, Richard Dixon (Dixon), purchased Jacobsen's "Imperial Two Stage Snow Jet" at a garage sale. The two-stage gasoline-powered snowthrower contained an intake auger with rotating blades to dig into snow (stage one), and a discharge impeller or fan with four rotating blades encased in an eight to nine inch chute to eject snow (stage two).
The snowthrower had two separate clutch controls: (1) a propulsion clutch lever on the left side of the dash panel to connect or disconnect engine power to propel the machine, and (2) an auger/impeller clutch lever on the right side to connect or disconnect power to the auger and impeller blades. The auger and impeller were geared together. Thus, a single clutch served to disengage and engage both sets of blades. The auger blades are fully exposed to view from the front of the machine. The impeller blades are housed at the base of the discharge chute and are not as readily apparent.
The snowthrower had three identical warning decals located on the left and right sides of the auger housing and on top of the discharge chute deflector. Each decal included the following sentence written in white, capital, one-quarter inch high letters on a clear background:

*576 CAUTION

KEEP HANDS AND FEET

CLEAR OF ROTOR
This message was followed by another sentence written in three-thirty-seconds of an inch high capital letters that stated:
STOP ENGINE BEFORE MAKING ADJUSTMENTS, REMOVING OBSTRUCTIONS, OR GOING IN FRONT OF UNIT
After Dixon purchased the Jacobsen snowthrower, he telephoned the manufacturer and requested "any information" it might have regarding the Two Stage Snow Jet, model no. 52600. In an envelope postmarked September 23, 1986, Dixon received the 1965 owner's and parts manuals for the snowthrower. Dixon testified at trial that after he received the manuals, he glanced at them quickly and then placed the manuals on a shelf in his workroom, believing that he would have an opportunity to thoroughly review them at a later date.
Approximately four months later, on January 22, 1987, plaintiff returned home from school sometime after noon. The school had closed early due to snow. Plaintiff hoped to surprise his parents, who were then at work, by clearing the driveway of snow before they returned home. Although plaintiff had previously operated a one-stage Atlas snowthrower that his father had owned, which contained only an intake auger, he had never operated the two-stage Jacobsen snowthrower.
Plaintiff was able to start the snowthrower after approximately eight to ten attempts. After going up and down the driveway two or three times for about five or ten minutes, the machine's discharge chute became clogged with snow. Plaintiff shifted the gear into neutral but did not turn off the snowthrower because he had such difficulty starting it.
Plaintiff attempted to loosen the clogged snow with a broom handle to no avail. He then removed his left glove because he did not want to get it wet, and placed his bare left hand into the *577 discharge chute. Plaintiff felt the snow loosening up and heard the sound of what he believed to be rocks crumbling. However, when he removed his hand from the chute, plaintiff realized to his horror that the sound he had heard was the impeller blades slicing through his fingers.
Plaintiff proceeded on two theories of liability against defendant: (1) he contended that the snowthrower was defectively designed in that it failed to contain a "deadman's control,"[3] and (2) he contended that the snowthrower was accompanied by inadequate warnings. Associated with the latter theory, plaintiff contended that defendant had a continuing duty to warn which it breached when it failed to provide his father with the more specific warnings then being utilized by defendant, and also failed to advise him that current snowthrowers were equipped with a deadman's clutch or control.
At trial, plaintiff testified that he had read the operating instructions on the snowthrower's dashboard as well as the two warning decals on the discharge chute before operating the machine. However, he believed that the decals' admonitions to "Keep Hands And Feet Clear Of Rotor" referred only to the obvious blades of the intake auger. He was unaware that there was also a discharge impeller with rotating blades in the chute.
In his answers to interrogatories, plaintiff stated that Dixon had showed him how to operate the snowthrower about one month prior to the accident, and that he was given written operating instructions for the machine. However, at trial, plaintiff could not recall if Dixon had shown him how to operate the snowthrower, and he maintained that he never saw the operator's manual prior to his accident. Dixon testified that he had never given plaintiff any instructions regarding the machine's operation.
*578 According to Frederic Blum, one of plaintiff's experts, the most dangerous aspect of the machine with the greatest potential for injury was the hidden impeller in the discharge chute which rotated at a speed four to five times faster than the auger. He opined that the warning labels on the snowthrower were inadequate because they failed to advise the average consumer of the danger. Specifically, Blum explained that the term "rotor" in the warning was ambiguous because a consumer could assume that "rotor" referred to the auger in front of the machine. It was pointed out that defendant's manuals did not use the term "rotor" to describe either the auger or impeller. Blum maintained that the warnings were inadequate because they did not alert the consumer to the existence of the hidden high-speed impeller fan. He suggested that an adequate warning on the chute would have substituted the word "danger" for "caution," and would have included the phrase "spinning fan inside" with the additional instruction: "Do not reach into chute or attempt to clear a clog unless engine is off or blade clutch is disengaged."
Blum also opined that the snowthrower was defectively designed because it lacked a deadman's control. His proposed deadman's control design would consist of squeeze levers on the machine's handlebars that would disengage the auger and impeller blades when the operator of the machine left the operating position behind the handlebar. Such a control was an important safety device because the operator would necessarily have to come from behind the machine to clear a clogged discharge chute whereupon the deadman's control would deactivate the auger and impeller.
According to Blum, in 1965, the year the snowthrower in question was manufactured, the technology existed to incorporate a deadman's control. In his opinion, a deadman's control was inexpensive and reliable, and could have been incorporated into the machine's design without impairing its usefulness. In his written report, he noted that one of defendant's competitors, Ariens Co., had manufactured a snowthrower with a deadman's *579 control in 1960. During cross-examination, defendant's counsel read without objection an excerpt from this court's decision in Bottignoli v. Ariens Co., 234 N.J. Super. 353, 357, 560 A.2d 1261 (App.Div. 1989), in which an Ariens representative had testified that, although the 1960 Ariens snowthrower had a deadman's control, it was removed in the 1965 model because of consumer dissatisfaction.
Howard Gage, a mechanical engineer, also testified on plaintiff's behalf. Gage likewise opined that the warning labels and the safety instructions found in the owner's manual were insufficient to warn the average consumer of the danger presented by the hidden impeller blades. Gage believed that the warning labels were misleading because the average user would assume that the term "rotor" referred to the auger. The warning labels and operating instructions on the machine were inadequate because they did not explicitly mention the impeller that rotated at 1700 rpms.
Jacobsen offered the testimony of two experts. The first of these was Neil Woelffer, a mechanical engineer who had formerly been employed by defendant for 27 years. Woelffer began working for defendant in 1958. In 1963, he developed a prototype of the two-stage snowthrower, and was responsible for its performance testing. He testified that when he was developing defendant's two-stage snowthrower, he was aware of the 1960 Ariens snowthrower with a deadman's control, and knew that Ariens had discontinued that feature in later models due to consumer dissatisfaction. For that reason, Woelffer chose not to incorporate a deadman's control in defendant's snowthrower, although he admitted that it was technologically feasible to do so.
Woelffer opined that defendant's snowthrower was safe to operate, and that if plaintiff had placed the throttle in the "stop" position and turned off the engine as the warning decals advised, the blades would have stopped rotating, and the accident would have been avoided. Further, Woelffer opined that the warning decals and safety instructions in the owner's manual were sufficient *580 to warn of any danger associated with operating the snowthrower. Under the heading "SAFETY SUGGESTIONS" and the subheading "OPERATION," the owner's manual advised: "8. Do not attempt to clear Auger, Discharge fan or discharge chute while engine is running." That precise instruction, however, was not on the machine.
Finally, defendant offered the expert testimony of David Sassaman, a mechanical engineer, who had been employed at Poloran Products as a chief engineer responsible for the design and development of snowthrowers, snowmobiles and lawnmowers. In August 1991, at defendant's behest, Sassaman examined and videotaped the snowthrower in question.
Sassaman opined that the snowthrower's operational controls were not defectively designed, and that the warning labels on the machine and the safety instructions in the owner's manual were not insufficient. According to Sassaman, the rotating blades of the auger and impeller were an "open and obvious" hazard for two reasons. First, the intense sound level (94-95 decibels) generated by the machine would indicate to the machine's operator that there was more than one source of sound. Second, if one stands in front of the machine, both the auger and impeller blades can be seen rotating. Sassaman conceded, however, that if the impeller were clogged with snow, one would not feel a rush of air from the snow-laden blades to indicate the presence of the rotating fan.
Sassaman also testified that the warning decals were adequate by 1965 standards because they were written in contrasting colors and because they were located on the machine's hazardous area. However, during recross-examination, Sassaman admitted that he would refer to the impeller housing as a discharge chute rather than the "rotor" as the warning decals had.
The jury returned its verdict in response to special interrogatories, finding that the snowthrower was not defective by reason of its design, nor by reason of inadequate warnings. In view of those findings, the jury did not address the issue of proximate causation, or plaintiff's comparative fault.

*581 I
Plaintiff argues that the judge erred in refusing to admit into evidence warnings contained in three owner's manuals for the 1970, 1975 and 1980 model years of defendant's snowthrowers, as well as 1975 and 1984 industry standards promulgated by the American National Standards Institute, Inc. (ANSI), which required considerably different warnings than those provided by defendant in 1965. Plaintiff maintained that the more recent manuals contained warnings regarding the hidden impeller hazard that were much more explicit than the warnings found in the 1965 owner's manual, and such evidence was relevant on the issue of defendant's continuing duty to warn of hazards associated with its product.
Additionally, the 1975 and 1984 ANSI safety specifications for snowthrowers required that all snowthrowers include an impeller control that would automatically stop the rotation of the impeller blades within five seconds of the operator leaving the operating position behind the snowthrower (a deadman's control). Importantly, the industry standards also required that explicit warning labels be placed near the discharge opening or impeller housing. For example, in 1975, the ANSI standard required a warning label near the discharge opening stating: "Keep Hands Out Of Discharge Guide While Engine Is Running" or similar wording. In 1984, not only was the word "Danger" and a message such as "Shut Off Engine Before Unclogging Discharge Chute" required to be placed on the impeller housing, but a pictorial description of a rotating blade inside the discharge chute was required as well.
The trial judge, relying upon Bottignoli, supra, determined that a manufacturer of consumer products was not charged with the duty to notify owners of an older product model that subsequent models had been updated with additional safety devices, or that subsequent warnings of a known danger had been made more specific. Moreover, the judge held that the proffered evidence was inadmissible pursuant to Evid.R. 51.
*582 One of plaintiff's theories of liability is that the warnings found on defendant's snowthrower in 1965 were inadequate to warn the user of the hazard imposed by the hidden impeller blades in the snowthrower's discharge chute. Plaintiff also maintains that defendant's later decision to change the warnings so as to make them clearer and more specific was evidence that defendant knew, or should have known, at least by the time Dixon made his inquiry, that the 1965 warnings were insufficient to warn of the hazard, and such knowledge obligated defendant to take reasonable steps to notify purchasers of the subsequently discovered defect, i.e., the inadequacy of its warnings.
However, defendant argues that case law and statutory law support its contention that a manufacturer has no continuing duty to inform purchasers of updated design changes. It evidently considers the more explicit wording of the post-1965 warning labels to be such an updated design standard. Therefore, defendant maintains that the post-1965, pre-1986, warning labels and ANSI standards were properly excluded from evidence because they were irrelevant. In our view, defendant is mistaken.
Pursuant to N.J.S.A. 2A:58C-2:
A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: ... b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.
N.J.S.A. 2A:58C-3a(1) provides that a manufacturer has no duty to anticipate a future state-of-the-art, and is charged only with the knowledge of design state-of-the-art as it existed at the time the product left the manufacturer's control. Stated differently, a manufacturer enjoys an absolute state-of-the-art defense for design defect claims. Seeley v. Cincinnati Shaper Co., Ltd., 256 N.J. Super. 1, 14, 606 A.2d 378 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992).
In this case, the jury found that the snowthrower was not defective by reason of its design, i.e., the failure to incorporate the deadman's control in 1965 did not result in an unsafe product *583 despite its availability.[4] Thus, because the snowthrower was not defective by reason of its design when manufactured, defendant had no duty to upgrade the Dixons' 1965 machine to incorporate the safer deadman control design adopted by defendant in 1975. See Ibid.
In a failure-to-warn case, however, a manufacturer enjoys no such immunity, and has a continuing duty to warn of dangers discovered even after a product leaves its control:
[T]here is a different duty to warn of a danger concerning the product, irrespective of when the knowledge is or could have been acquired.
[Id. 256 N.J. Super. at 15, 606 A.2d 378.]
N.J.S.A. 2A:58C-4 provides in relevant part:
In any product liability action the manufacturer or seller shall not be liable for harm caused by a failure to warn if the product contains an adequate warning or instruction or, in the case of dangers a manufacturer or seller discovers or reasonably should discover after the product leaves its control, if the manufacturer or seller provides an adequate warning or instruction.
[N.J.S.A. 2A:58C-4 (emphasis added).]
To escape liability, a manufacturer who discovers, or who should reasonably have discovered after shipment of its product, that the product was unsafe, must provide its customers with "an adequate warning or instruction." N.J.S.A. 2A:58C-4; Feldman v. Lederle Laboratories, 97 N.J. 429, 456-57, 479 A.2d 374 (1984).
Unlike N.J.S.A. 2A:58C-3a(1) applicable to design defects, N.J.S.A. 2A:58C-4, applicable to warning defects, establishes no state-of-the-art defense limiting a manufacturer's liability to what it knew or should have known at the time of manufacture. Rather, it requires the manufacturer to warn of dangers it discovers or reasonably should discover after the product leaves its control. N.J.S.A. 2A:58C-4; Fabian v. Minster Mach. Co. Inc., 258 N.J. Super. 261, 274-75, 609 A.2d 487 (App.Div.), certif. denied, 130 N.J. 598, 617 A.2d 1220 (1992).
*584 Defendant, relying upon this court's decisions in Jackson v. New Jersey Mfrs. Ins. Co., 166 N.J. Super. 448, 400 A.2d 81 (App.Div.), certif. denied, 81 N.J. 330, 407 A.2d 1204 (1979), and Bottignoli, supra, asserts that a manufacturer has no obligation to notify its customers of post-sale safety design changes resulting from advances in the state-of-the-art. Although the precedential value of those cases was questioned by Judge Dreier in both Lally v. Printing Mach. Sales and Service Co., Inc., 240 N.J. Super. 181, 185 n. 3, 572 A.2d 1187 (App.Div. 1990) and Seeley, supra, 256 N.J. Super. at 15 n. 7, 606 A.2d 378, we need not resolve that dispute here, because we are of the view that the facts of this case are clearly distinguishable from those cases, and, as such, justify a determination that defendant here had a continuing duty to warn. See Feldman, supra, 97 N.J. at 455, 479 A.2d 374 (citing Konrad v. Anheuser-Busch, Inc., 48 N.J. Super. 386, 388, 137 A.2d 633 (Law Div. 1958)) ("Cases state principles but decide facts, and it is only the decision on the facts that is binding precedent.").
We believe the facts in this case are more nearly akin to those in Seeley, supra, and that the principles announced in that case provide appropriate guidance here. In this case, as in Seeley, the manufacturer was aware of the identity of the current owner of the product. That was not the case in Bottignoli, supra. In Seeley, as here, the current owner of the product requested information pertaining to the machine. Seeley, supra, 256 N.J. Super. at 6, 606 A.2d 378. Such was not the case in either Bottignoli, supra, or Jackson, supra. However, in response to the owner's request in Seeley, the manufacturer forwarded not only the owner's and parts manual, but also a publication concerning how to safely guard the machine, "three safety signs to be posted on the machine," and the current ANSI standards. Id. at 8, 606 A.2d 378. The jury in Seeley, as in this case, determined that the product did not have a design defect at the time it was manufactured, and that determination was not challenged on appeal.
The focus of the Seeley decision was on defendant's alleged continuing duty to warn under N.J.S.A. 2A:58C-4. Id. at 14, 606 *585 A.2d 378. It was in that context that this court found defendant manufacturer had the duty to warn of dangers of which it learned post-manufacture, including notice of design changes since the date of manufacture which would make the operation safer. The Seeley court concluded that the manufacturer had discharged that duty. Id. at 14-17, 606 A.2d 378.
Here, in contrast to Seeley, when the current owner requested "any information" concerning the snowthrower, he received only the 1965 owner's manual. There was no warning that a deadman's control had been incorporated in such machinery since 1975.
Quite aside from plaintiff's argument that defendant had an obligation to warn about changes in design affecting safe operation, plaintiff also argues that defendant had a duty to advise plaintiff about changes in its warnings and provide new warning labels reflecting those changes. Plaintiff maintains that, at some point after the product entered the stream of commerce, defendant learned that its warnings were insufficient. Such knowledge, plaintiff contends, is evidenced by the more explicit warning labels and safety instructions defendant utilized as early as 1975. Whether that information came to defendant through its own experience, through the industry's experience, or both, is irrelevant. The point is that such evidence is relevant on the question of whether defendant had discovered a defect that it believed had not existed in 1965, i.e., its original warnings were inadequate to convey the necessary information to alert an average user to the hidden danger.
Plaintiff is not advancing a novel proposition. Clearly, a manufacturer with knowledge that an original warning placed on the product is no longer sufficient to inform the user about dangers inherent in the product may be found liable for failing to change its warnings. Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 991-93 (8th Cir.1969); Parke-Davis & Co. v. Stromsodt, 411 F.2d 1390, 1400 (8th Cir.1969); Tinnerholm v. Parke Davis & Co., 285 F. Supp. 432, 451 (S.D.N.Y. 1968); Incollingo v. Ewing, 444 Pa. *586 263, 444 Pa. 299, 282 A.2d 206, 219-23 (1971). The excluded evidence in this case was relevant on that issue.
The imposition of a continuing duty to warn post-manufacture, especially as to design changes, has been criticized in other jurisdictions. However, our research has indicated that the reluctance in imposing such a duty has focused on the burden that such a duty places on manufacturers to ascertain the identity of current owners of the product, especially consumer products. Cover v. Cohen, 61 N.Y.2d 261, 473 N.Y.S.2d 378, 461 N.E.2d 864, 871 (1984); Kozlowski v. John E. Smith's Sons Co., 87 Wis.2d 882, 275 N.W.2d 915, 923-24 (1979). See also Carrizales v. Rheem Mfg. Co., Inc., 226 Ill. App.3d 20, 168 Ill.Dec. 169, 589 N.E.2d 569, 579 (1991), appeal denied, 146 Ill.2d 623, 176 Ill.Dec. 794, 602 N.E.2d 448 (1992); Walton v. Avco Corp., 383 Pa.Super. 518, 557 A.2d 372, 376-80 (1989), aff'd in part and rev'd in part, 530 Pa. 568, 610 A.2d 454 (1992); Lynch v. McStome and Lincoln Plaza Assoc., 378 Pa.Super. 430, 548 A.2d 1276, 1281 (Pa.Super. 1988). No such policy consideration exists where the owner is known. The imposition of a duty on a manufacturer to warn of dangers after a product is manufactured, and the extent of that duty, is essentially rooted in concepts of fairness. Feldman, supra, 97 N.J. at 454-57, 479 A.2d 374. See Brown v. U.S. Stove Co., 98 N.J. 155, 173, 484 A.2d 1234 (1984) ("[T]he existence of a duty that will affix responsibility for resultant injury ultimately involves notions of public policy."). A strict liability warning claim is "almost identical to negligence analysis in its focus on the reasonableness of the defendant's conduct." Feldman, supra, 97 N.J. at 451, 479 A.2d 374. We need not decide the outer limits of a manufacturer's duty to inform consumers generally of updated warnings or design changes with respect to dangers discovered since the time of manufacture. Suffice it to say that, in the context of this case, where the manufacturer knew the identity of the owner of its product, we have no hesitation in holding that such a duty existed, and it was for the jury to determine whether that duty had been discharged.

*587 II
We now turn to the question of whether the admission of the post-1965 manuals and the ANSI standards adopted by defendant and incorporated in the manuals would run afoul of Evid.R. 51. Evid.R. 51 provides:
When after the occurrence of an event remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.
[Evid.R. 51 (emphasis added).][5]
The rule is applicable to strict liability as well as to negligence cases. Price v. Buckingham Mfg. Co., 110 N.J. Super. 462, 464-65, 266 A.2d 140 (App.Div. 1970).
It has been said that this rule is based upon social policy, as opposed to the relevance of such evidence on the issue of fault and, as such, is designed to encourage remedial measures to be taken in order to avoid the occurrence of similar accidents. See Biunno, Current N.J.Rules of Evidence, comment 1 on Evid.R. 51 (1993). "Event," however, as used in the rule, refers to the plaintiff's accident and not to the date the product was originally manufactured or distributed. Lavin v. Fauci, 170 N.J. Super. 403, 409, 406 A.2d 978 (App.Div. 1979). Hence, the rule would not be a bar to the admissibility of remedial measures, such as the warning labels or safety instructions in the instant matter, issued by defendant after the date of manufacture, but prior to the date of the "event" (plaintiff's accident).
In Shatz v. TEC Technical Adhesives, 174 N.J. Super. 135, 141, 415 A.2d 1188 (App.Div. 1980), we held that the trial judge erroneously precluded plaintiff from admitting into evidence a warning label on a container of mastic cement manufactured by defendant that had been changed prior to the date of plaintiff's accident. In *588 rejecting defendant's assertion that Evid.R. 51 barred the admission of the label change, Judge Greenberg wrote:
[W]e perceive of no social policy furthered by allowing a defendant to keep from the jury evidence of remedial conduct undertaken before an accident. Certainly we ought not to presume that defendant would have declined to change its label in apprehension that in claims arising from accidents that had not yet happened the prior label by comparison would be asserted to have given inadequate warnings. Indeed, as a matter of policy the evidence of change should have been admitted. [Id. at 141-42, 415 A.2d 1188.]
Defendant attempts to factually distinguish Shatz, supra, from the instant matter and argues that unlike the updated warning labels there, the updated labels here were not that different from the original labels, and, if admitted into evidence, would only serve to confuse the jury. The short response to defendant's contention is that the argument is irrelevant to a proper interpretation of the rule. On retrial, the judge is free to engage in an appropriate N.J.R.E. 403 analysis, if one is called for, regarding the updated labels, and, if admitted, the jury can be asked to consider, as part of its overall assessment of the adequacy of the warnings given, whether the changed wording differed significantly from that of the original warning labels.
In Molino v. B.F. Goodrich Co., 261 N.J. Super. 85, 617 A.2d 1235 (App.Div. 1992), certif. denied, 134 N.J. 482, 634 A.2d 528 (1993), Judge Shebell, writing for the court, noted that Evid.R. 51 was not a bar to remedial measures taken after manufacture but before the plaintiff's accident. Id. 261 N.J. Super. at 102-03, 617 A.2d 1235. He observed that, although a manufacturer may be deterred from placing a warning on a product if that remedial action may be used to bolster already existing claims, it also "makes sound business sense" for a manufacturer "not to delay or avoid giving warnings of known dangers at the earliest possible opportunity in order to prevent avoidable accidents and the resulting claims." Ibid. On remand, Judge Shebell advised the trial court to weigh the probative value of such evidence against its possible prejudice and ability to confuse the jury. Id. at 103, 617 A.2d 1235. The Molino court also noted that post-manufacture warnings could only be relevant in the context of the continuing *589 nature of a manufacturer's duty to warn; more particularly, such information may be evidential "of the time when defendant became sufficiently aware of the danger to necessitate an attempt to convey a warning to earlier purchasers and continuing users of its product which did not contain a warning." Ibid.
Here, defendant's post-manufacture warning label changes arguably evidence when defendant became aware that its prior warnings were inadequate to apprise the user of the snowthrower's hazard. Interestingly, although the Bottignoli court ultimately held that a snowthrower manufacturer had no continuing duty to warn unknown owners of updated industry design standards, the court observed that the ANSI design standards issued after the snowthrower was manufactured were admitted into evidence without challenge. Bottignoli, supra, 234 N.J. Super. at 357-58, 560 A.2d 1261.
Although the Molino court noted that an Evid.R. 8, now N.J.R.E. 104, hearing would also provide a proper forum to elicit relevant testimony regarding the feasibility of attempting to reach users of a product that had been purchased years before, Molino, supra, 261 N.J. Super. at 103, 617 A.2d 1235, that concern is not present in this case because the current owner's identity was known to defendant.[6] Defendant is hardpressed to argue that notification to Dixon would be problematic. A bold decal on the front cover of the 1965 owner's manual, a sheet of paper containing new warning labels, or an addendum advising of the changed warnings and updated design may have sensitized Dixon, and in turn, plaintiff, to the snowthrower's hazard.

III
Defendant suggests that any error with respect to the exclusion of the subject evidence was harmless in light of Dixon's *590 testimony concerning his use of the material he received, and plaintiff's own conduct. The argument is flawed because the evidence relied upon by defendant is irrelevant to the issue of defect.
A basic principle, recently highlighted by our Supreme Court, is that the question of product defect must be decided without reference to the specific conduct or knowledge of individuals involved in the case, because product safety can only be judged in the context of the average consumer. Johansen v. Makita U.S.A., Inc., 128 N.J. 86, 99-103, 607 A.2d 637 (1992). "[T]he post-marketing conduct of one plaintiff cannot inform that determination." Id. at 101, 607 A.2d 637.
Thus, the jury in this case should have been specifically instructed that neither plaintiff's, nor Dixon's, conduct was relevant in its determination of whether defendant acted reasonably in providing the information that it did in response to Dixon's request for "any information" pertaining to the product. Such an instruction is "essential" to a fair trial and was not given here. Ibid. Dixon's conduct, though irrelevant on product defect, is relevant on the issue of proximate causation. Likewise plaintiff's conduct, though not relevant on product defect, is relevant on the issues of proximate causation and/or comparative fault. Id. at 102-03, 607 A.2d 637; Fabian, supra, 258 N.J. Super. at 276-77, 609 A.2d 487. These issues are typically jury questions, and were not reached in this case. As pointed out earlier, a jury could very well conclude on retrial that the insertion of an addendum to the 1965 manual and a sheet containing new warning decals in defendant's correspondence might have created more acute awareness in Dixon and plaintiff of the risks of operating a snowthrower of this design configuration, and prompted different conduct on their part.

IV
Plaintiff contends that the snowthrower's warnings were inadequate as a matter of law, and that the jury's finding that the *591 snowthrower was not defective because it contained adequate warnings must be reversed. We disagree.
Sufficient evidence was presented to permit reasonable minds to differ as to whether the warnings were "adequate" as that term is defined in N.J.S.A. 2A:58C-4. An adequate product warning or instruction is:
[O]ne that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used
....
[N.J.S.A. 2A:58C-4.]
The gravamen of plaintiff's inadequate warnings theory is that the warnings were at best confusing, and at worst misleading, because they did nothing to apprise an operator of the hidden impeller fan located in the discharge chute. Specifically, plaintiff argues that the words "discharge chute" or "impeller" should have been substituted for the less explicit word "rotor" in the snowthrower's warning decals. Additionally, plaintiff maintains that the word "auger" found on the snowthrower's operating instruction decal and the word "rotor" found on its warning decals are singular terms that could lead an operator to believe that the only rotating mechanism on the machine was the single auger. In fact, plaintiff testified at trial that he believed that the word "rotor" on the warning decals was a reference to the auger blades that were in plain view.
Although plaintiff's two experts testified that the warnings were inadequate, defendant's expert witnesses testified to the contrary, and opined that the warnings were sufficient to apprise an operator of the danger associated with the rotating impeller in the discharge chute. Woelffer, a mechanical engineer and former employee of defendant, asserted that if plaintiff had placed the throttle in the "stop" position and turned off the engine before attempting to clear an obstruction as the warning decals advised, the accident would have been avoided.
*592 Moreover, Sassaman, defendant's second expert, maintained that the snowthrower's warning decals were "adequate by 1965 standards" because they incorporated contrasting colors and because they were located on the snowthrower's hazardous areas  either side of the auger housing and on top of the discharge chute deflector. However, during recross-examination, Sassaman suggested that he, personally, would refer to the impeller housing as a "discharge chute" rather than a "rotor" as the warning decals had.
Given the conflicting testimony of the experts, the issue as to the adequacy of the snowthrower's warnings was, and remains, a jury question.

V
Plaintiff maintains that the issue of his comparative fault was improperly before the jury because defendant failed to offer any evidence to support its position that plaintiff had knowingly and voluntarily encountered a known risk when he placed his hand into the snowthrower's discharge chute with the engine running.
At the close of all the evidence, plaintiff moved to strike the defense of comparative fault. The trial judge denied plaintiff's motion, noting that sufficient evidence was presented to submit the issue to the jury. The judge's determination was correct.
"[W]hen a plaintiff with actual knowledge of the danger presented by a defective product knowingly and voluntarily encounters that risk, a trial court should submit the comparative-negligence defense to a jury." Johansen, supra, 128 N.J. at 94-95, 607 A.2d 637. Plaintiff argued below, and again on appeal, that because he was unaware that a rotating impeller was located in the snowthrower's discharge chute, he was unaware of the danger posed by the hidden impeller. Thus, he contends that he did not knowingly encounter the risk of placing his hand into the snowthrower's discharge chute while the machine's engine was still running. However, defendant offered sufficient evidence to rebut that assertion.
*593 Conflicting evidence was presented at trial regarding what instructions, if any, plaintiff received from Dixon regarding the snowthrower's operation. Dixon testified that he did not instruct plaintiff on the operation of defendant's snowthrower prior to the accident. Dixon suggested that he knew that the engine should be shut off before attempting to clear a clog, but, curiously, he did not impart that information to his son. However, in his answers to interrogatories, plaintiff had stated that approximately one month before his accident, Dixon had shown him how to operate defendant's snowthrower. At trial, plaintiff could not recall if Dixon had shown him how to use the snowthrower. A jury could infer from this inconsistency that plaintiff received instructions, including cautions about cleaning the chute with the engine running, and that plaintiff lied at trial to deflect the logical inferences flowing from such knowledge.
Additionally, there was evidence that plaintiff attempted to clear the chute with a stick before using his hand to do so. A jury could infer from such evidence that plaintiff's use of the stick was a recognition that using his hand to clear the chute involved risk of injury.

VI
Plaintiff argues that the court erred when it failed to grant his request that the jury be instructed concerning defendant's alleged destruction of evidence. The contention is without merit.
The tort of spoliation of evidence was not pled by plaintiff, nor did plaintiff move to amend the complaint to include such a cause of action. Viviano v. CBS, Inc., 251 N.J. Super. 113, 597 A.2d 543 (App.Div. 1991), certif. denied, 127 N.J. 565, 606 A.2d 375 (1992), upon which plaintiff relies to support his claim, requires as much.
On remand, plaintiff may move to amend his complaint. We take no position on the merits of the motion, or the underlying claim.

*594 VII
Plaintiff asserts that the judge erred by precluding admission of a report issued by the United States Product Safety Commission (NEISS report) regarding the number of injuries associated with snowthrowers. Only the cover letter for the report and an explanation of its tables were included in the appellate record. At trial, plaintiff argued that the report, which apparently related the frequency of snowthrower accidents from 1979 to 1991, would demonstrate that the majority of snowthrower-associated injuries involved contact with the impeller in the discharge chute. Because the report discussed accidents that had occurred after 1965, the date the snowthrower at issue was manufactured, the judge stated that the report was not "evidential."
Because the body of the report has not been included in the appendix, and no testimony concerning its significance was offered at an Evid.R. 8 hearing, the issue has been insufficiently developed. Thus, we are unable to give a definitive ruling on the subject. However, because the matter is being remanded for retrial on an issue related to this one, we make the following observations for the trial judge's consideration.
Insofar as the report covers a period after the snowthrower's manufacture, but prior to plaintiff's accident, the report may be relevant to the issue of defendant's continuing duty to warn, especially because the defendant issued more explicit warnings subsequent to the date of manufacture and prior to the date of plaintiff's accident. Simply put, the report may be indicative of the degree of risk associated with the use of such products and, if the risk was substantial, may be indicative of the point in time when defendant knew or should have known that consumers using such products required better instructions for safe operation, especially when using machines without a deadman's control. In Molino, this court observed:
The relevance of a warning placed on a product ten to eleven years after its manufacture is doubtful in the absence of a detailed chronology of the accident history of the product, except with regard to the continuing nature of the duty to warn.

*595 [Molino, supra, 261 N.J. Super. at 103, 617 A.2d 1235.]
Thus, the trial judge should not have rejected the NEISS report out-of-hand as irrelevant to plaintiff's claim. The subject should be further developed on remand in the context of a N.J.R.E. 104 hearing, where the trial judge can more accurately assess the competency and reliability of the information, and its probative value as compared to possible prejudice resulting from its admission.

VIII
Plaintiff contends that a new trial is warranted because the trial judge refused to allow cross-examination of defendant's expert Woelffer regarding testimony he had given in prior litigation. Plaintiff attempted to introduce Woelffer's previous litigation testimony concerning the frequency of clogging in the snowthrower's discharge chute. According to plaintiff, although Woelffer had testified in the instant matter that clogging was a well known occurrence with snowthrowers under certain snow conditions, in prior litigation he had stated that clogging occurs on all snowthrowers. Plaintiff argued that he should be permitted to point out this inconsistency to impeach Woelffer's credibility.
The trial judge rejected plaintiff's argument, noting that the perceived inconsistency would be resolved if plaintiff would simply ask Woelffer to describe the snow conditions to which he was referring. Moreover, the judge suggested that there was no inconsistency, and that plaintiff really wanted to introduce Woelffer's prior testimony to alert the jury to the fact that defendant had been involved in prior litigation involving its product. We agree with the judge's assessment. A trial judge has broad discretion in determining the proper limits of cross-examination of a witness whose credibility is put in issue. State v. Pontery, 19 N.J. 457, 473, 117 A.2d 473 (1955). Here, there was no abuse of that discretion.

*596 IX
In our view the errors we have discussed impacted on the jury's ability to evaluate plaintiff's warning defect claim in its entirety. Thus, we reverse and remand for a new trial on all issues, except plaintiff's design defect claim which was resolved in favor of defendant and from which plaintiff does not appeal.
NOTES
[1] The term "snowthrower" and "snowblower" were used interchangeably during trial. We have used the term "snowthrower" in this decision.
[2] The parties stipulated that the various corporate defendants be referred to as Jacobsen Manufacturing Company in the singular for the purpose of the trial.
[3] A deadman's control is a device which either stops the machine completely, or disengages the auger and impeller when the operator leaves his work station at the rear of the machine.
[4] Plaintiff's appellate briefs do not specifically raise any issues pertaining to the resolution of the design defect claim.
[5] Former Evid.R. 51, under which this issue was decided in the trial court, is now N.J.R.E. 407. The new evidence rule is essentially the same as the former rule and would require the same result.
[6] In ordering a hearing on the subject the court was apparently sensitive to the issue discussed on pp. 585-86, 637 A.2d on pp. 923-24 of this opinion regarding the appropriate perimeters to be placed on the continuing duty to warn.